IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**TANARIA HEARD**, individually and as Special Administrator
of the Estate of Dezmen McBride                                                    **PLAINTIFF**


V.                                      Case No. 4:24-CV-00325-KGB

**ASSOCIATION OF ARKANSAS COUNTIES
RISK MANAGEMENT FUND**;
**JEFFERSON COUNTY, ARKANSAS**;
**SHERIFF LAFAYETTE WOODS, JR.**,
named in his official capacity only; and
**LT. SAMUEL BAKER JR.,** named in his
individual and official capacities                                                 **DEFENDANTS**

## RESPONSE TO COUNTY DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### McBride's medical background

1.      Prior to his incarceration in May/June, 2021, Dezmen McBride had a past medical history significant only for several episodes of sexually transmitted infection (STI). During those treatment encounters he reported no past medical history. His vital signs and physical exam were unremarkable at those encounters. Ex. 2 & 3.

**RESPONSE**: Admitted.

### McBride's Incarceration in Jefferson County

2.      On May 21, 2021, Dezmen McBride was transported to the Dub Brassell Detention Center in Jefferson County, where he was transported from the Pulaski County Detention Center. Ex. 2 & 3.

**RESPONSE**: Admitted.

3.      On May 31 and/or June 1, 2021, McBride was involved in an altercation(s) with other inmates. At least one of these altercations involved Mr. McBride being struck near his left eye and also involved Mr. McBride head-butting another inmate. Ex. 2 & 3.

**RESPONSE**: Denied. Admitted only that records support Dezmen was involved in a fight with another detainee, Jamarius Wainright, in the early morning hours of June 1, 2021.  Whether Mr. McBride headbutted another inmate is in dispute. Plaintiff's Exhibit V – Jefferson County Sheriff's Department, Internal Affairs Division Summary of Investigation, p. 1-3.

4.      The jail sergeant who reported the altercation(s) consulted with the jail nurse and a decision was made to transport Mr. McBride to the hospital for evaluation. Ex. 2 & 3.

**RESPONSE**: Denied. Admitted only that Sgt. DeLucas Etherly witnessed the altercation between Dezmen and the inmate on the morning of June 1, 2021. *Id*. This incident occurred while Etherly was serving breakfast, at approximately 4:30am. *Id*., p. 3 and Plaintiff's Exhibit W – Sgt. DeLucas Etherly Recorded Interview, 6:8-9.

However, Etherly did not submit a written report on the fight until June 6, 2021, the day of Dezmen's death; said report was signed by Captain Ed Adams on June 7, 2021. *Id*., p. 5. Jefferson County Policy and Procedures Manual for W.C. "Dub" Brassell Adult Detention Center requires officers to write incident reports on any infraction of detention facility rules or procedures and submit them to the detention facility supervisor. Plaintiff's Exhibit X, Jefferson County Sheriff's Office W.C. Brassell Adult Detention Center Policies and Procedures, p. 55 at (g).

After the fight, Etherly separated Dezmen and Wainright, and placed Dezmen into a separate pod, A-1-01. Plaintiff's Exhibit W, Etherly Interview, 5:22-26. Etherly stated he placed Dezmen in the A-101 pod because Dezmen asked to be placed there and Etherly didn't want to

"take chances of putting him somewhere somebody else would probably jump on him." *Id*., 12:9-30.

Dezmen did not see a nurse after the fight, because there was no nurse on duty at the time. *Id*., 8:1-9. Etherly documented the incident in the booking notes for the next shift. Plaintiff's Exhibit Y – Report of Investigation, p. 6.

Dezmen did not see a nurse or receive medical treatment during the day on June 1, 2021, even though the fight was documented in booking notes for the next shift. *Id*.

Zion Gadson was detained in the same area as Dezmen on June 1, 2021. Plaintiff's Exhibit BB – Zion Gadson Recorded Interview. Gadson said Dezmen arrived in the new unit upset about the fight, but calmed down and played cards with him and other men in the unit. *Id*., p. 2. As the day progressed, Dezmen fell asleep and woke up complaining of head pain. *Id*. The men in his cell called for a nurse on the intercom "like, five or six times," but no one answered. *Id*. Dezmen began vomiting "big chunks" and "blood" into a mop bucket in the cell. *Id*. Gadson observed a big "knot" near Dezmen's left temple. *Id*., p. 3.

As Dezmen continued vomiting, Gadson kept calling on the intercom, pressing it over and over until "it pissed somebody off to answer the button." *Id*., p. 3. Etherly had returned for his next shift, which started at 6pm on the night of June 1, 2021, and he responded. *Id*., p. 3-4.

Gadson and others in Dezmen's unit told Etherly that Dezmen had been sick and vomiting all day. Plaintiff's Exhibit W – Etherly Interview, p. 13-15 and Plaintiff's Exhibit CC – Lt. Darinda Smith Recorded Interview, p. 19.

The Lieutenant on the day shift on June 1, 2021, was Lt. Samuel Baker. *Id*., p. 20. Lt. Baker did not make any notes about Dezmen for the following shift, even though Gadson testified that Dezmen had been sick and vomiting blood most of the day while he and other detainees repeatedly

buzzed the intercom and asked for help. *Id*., p. 20. and Plaintiff's Exhibit BB – Gadson Interview, p. 2-3.

On the night of June 1, 2021, over twelve hours after the fight, Etherly called the prison nurse on his cell phone and told her that Dezmen had been in an altercation and had a "knot" on his head. Plaintiff's Exhibit W – Etherly Interview, p. 15. The nurse advised Etherly to have Dezmen transported to the hospital. Plaintiff's Exhibit V – Summary of Investigation, p. 7 at 11.

JCSO's investigation found that Sgt. Lucas knowingly violated policy and procedures by failing to complete a written incident report after the initial altercation and failing to provide the required documentation. *Id*., p. 24. Etherly resigned from JCSO on July 2, 2021. *Id*.

5.    At approximately 10:55 p.m. on June 1, 2021, McBride was transported to the Jefferson Regional Medical Center (JRMC) by transport deputy. That emergency department (ED) visit was significant for:

a.    Upon triage Mr. McBride was complaining of a headache and nausea/vomiting which he said began at 6:00 a.m. He also reported that he was "hit in the head yesterday" and was vomiting blood or coffee ground emesis today.

b.    His initial vital signs were: temperature (T) = 98.4, pulse (P) = 84, respirations (R) = 18, blood pressure (BP )= 92/50, oxygen saturation (Sa02) = 100%.

c.    Mr. McBride told the ED physician that his symptoms began "after dinner. "There was no known precipitating event, but the patient did report being hit in the head yesterday. He did not have any loss of consciousness.

d.      On review of systems Mr. McBride had no other complaints. He denied constipation as well as any cardiac or respiratory symptoms. He admitted to smoking daily but denied drug or alcohol use.

e.      His physical exam was significant for diaphoretic skin, pain of 5/10, and a diffusely tender abdomen with guarding.

f.      A computerized tomography (CT) scan of his head done STAT due to the headache and nausea/vomiting showed no intracranial hemorrhage and no cerebral edema or mass effect. No acute intracranial abnormality was found.

g.      Abdominal x-rays showed no bowel obstruction or other acute intra-abdominal process. There was scattered gas and fecal material throughout the colon .In addition, heart size was normal and the lungs were clear with no acute pulmonary process.

h.      Lab tests showed a normal hematocrit and hemoglobin indicating no anemia or significant blood loss, a negative COVID test, a comprehensive metabolic panel with unremarkable results, a normal urinalysis aside from 1+ ketones, normal white blood cell count indicating no infection, and normal amylase and lipase.

i.      Mr. McBride was given intravenous fluids in the ED along with a dose of pain medication and Zofran for nausea. He was also dispensed a bottle of magnesium citrate to drink for constipation. Mr. McBride apparently did not drink the magnesium citrate in the ED but brought it back with him to the the jail upon discharge.

j.      Mr. McBride was improved in ED. Vital signs on discharge were: P = 79, BP = 127/70, and Sa 02= 100%.

> k.    Mr. McBride was discharged into the custody of the Jefferson County
> Sheriff's Office (JCSO) deputy at 1:30 a.m. on 6/2/2021. His final ED diagnoses
> were: headache and constipation. He was given standard discharge instructions for
> constipation. He was sent back to the the jail with a prescription for Zofran as
> needed for nausea and dietary instructions for 24 hours. The ED physician did not
> believe physician follow-up was required. Ex. 2 & 3.

**RESPONSE**: Admitted. Plaintiff was transported to the hospital at approximately 10:55pm on June 1, 2021, after being in an altercation at approximately 4:30am on the morning of June 1, 2021, without ever actually seeing or being evaluated by a prison nurse. Plaintiff's Exhibit V.

Plaintiff's discharge instructions were to return immediately to the ED if his symptoms worsened. Defendant's Exhibit 2, p. 120. Plaintiff was not transported back to the hospital until June 5, 2021. Defendant Exhibit 2, p. 155. When Plaintiff was transported, he was experiencing altered behavior and was unresponsive, "though nurse reports she thinks he is ok." *Id*. By the time EMS was called, Plaintiff was incontinent and had decreased level of consciousness. *Id*. After EMS arrived, Plaintiff stopped breathing; he was actively coding when he arrived at the hospital, and he was pronounced dead at 12:18pm. *Id*., p. 171-177.

6.    On the Wednesday morning of June 2, 2021, the nurse on duty at the jail spoke with Mr. McBride's mother about his condition and also evaluated Mr. McBride. Mr. McBride reported: "They jumped on me and hit me in my eye. I want to go back to the back. I know I asked to come up here but now I want to go to the back." Ex. 2 & 3.

**RESPONSE**: Admitted. Dezmen returned from the hospital at around 2am on June 2, 2021. Plaintiff's Exhibit Y – Report of Investigation, p. 10. He was transported to and from the

hospital by Deputy Jermaine Anderson. Plaintiff's Exhibit AA – Deputy Jermaine Anderson Recorded Interview. Dezmen vomited in Deputy Anderson's vehicle while he was being transported to Jefferson Regional Medical Center. *Id.*, 12:17-25. Upon the return to Brassell, Dezmen vomited again. *Id.*, 12:26-29. Dezmen complained to Anderson that he was afraid to fall asleep, which Anderson found "strange." *Id.*, 12:1-10. He continued complaining about head pain and nausea after he returned to the facility. *Id.*, 13:22-14:10.

Upon his return, Sgt. Etherly placed Dezmen in an area of Brassell used as a quarantine pod (Misdemeanor 1), observing that he appeared weak and complained that he didn't feel well and his head hurt. Plaintiff's Exhibit V – Summary of Investigation, p. 4.

At around 3:40am, Dezmen called the mother of his young daughter and told her that his head was throbbing and he was throwing up. Plaintiff's Exhibit PP. Dezmen told her he felt like he was going to die and he was scared. *Id.* Dezmen did not get up to receive breakfast when it was served that morning. *Id.*

Dezmen complained to Lt. Darinda Smith that his head was hurting and he could not see. Plaintiff's Exhibit Y – Report of Investigation, p. 13. She responded that since he had just returned from the hospital, the nurses would not send him back out, but that the nurse would be back in shortly. *Id.*, p. 13.

JCSO's investigation later found that Lt. Smith knowingly violated policy and procedures by failing to forward Dezmen's requests for medical care to the medical staff for assessment. IAB recommended Smith be issued a Written Warning. Plaintiff's Exhibit V – Summary of Investigation, p. 24-25.

Later that day, Captain Adams moved Dezmen again, from Misdemeanor 1 to a cell in the booking area of Brassell. *Id.*, p. 5. Dezmen was wearing his blanket as a cape, talking to himself,

and acting "crazy," according to Adams. *Id*., p. 5-6. Other detainees told Adams that he was acting crazy and kicking the door of the cell, and that they were glad he was being moved. *Id*., p. 6.

On the evening of June 2, 2021, Dezmen was in the booking area cell with another detainee, Ulyssis Chandler Jr. Plaintiff's Exhibit DD – Ulyssis Chandler Recorded Interview, p. 1. Chandler testified that while in the cell, Dezmen fell to the ground, sweating, kicking, and having seizures. *Id*., p. 2-5. Chandler reported this to the guards and they were able to get him up onto his bunk. *Id*., p. 4.

7.      On the morning of June 3, 2021, the nurse on duty at the jail received the magnesium citrate which had been sent back from the ED. The nurse attempted to administer the medication during morning pill call, but Mr. McBride was asleep and she left the laxative with security staff for Mr. McBride to drink once he was awake. Ex. 2 & 3.

**RESPONSE**:  Admitted. Nurse Lanetra Evans-Shelton was found to have violated JCSO policies and procedures by failing to administer Dezmen McBride the medicine he was prescribed by JCSO, instead leaving it with Lt. DeBerry to be administered. Plaintiff's Exhibit V – Summary of Investigation, p. 25. IAB recommended a written warning, however Evans-Shelton was on administrative leave at the time, so no action was taken. *Id*. and Plaintiff's Exhibit LL – IAB Findings Against Officers, p. 6.

8.      On Thursday, June 3, 2021, the nurse on duty at the jail interacted with Mr. McBride, who requested a shower. The nurse relayed this request to the security staff. Mr. McBride cleaned his cell, showered, and was noted to be in no distress. Ex. 2 & 3.

**RESPONSE**: Denied. Admitted only that a nurse, Carolyn Iverson, gave testimony that Dezmen asked for a shower, and Captain Adams told her that he could take one once he cleaned his cell. Plaintiff's Exhibit EE – Nurse Carolyn Iverson Recorded Interview Part One, p. 1. Dezmen

was given a broom and he cleaned his cell. *Id.* Iverson stated that Dezmen was not acting sick and that she didn't know him enough to state if he was acting "normal" or not. *Id.*, p. 2.

However, Iverson testified that on June 2, 2021, Dezmen was in a suicide suit (at Brassell, called a "Bam Bam suit"), and she was told that Dezmen made threats that he wanted to kill himself. Plaintiff's Exhibit FF, Nurse Carolyn Iverson Recorded Interview Part Two, p. 3. Iverson testified that Dezmen was acting "very different," like "his mental status was kinda off." *Id.*, p. 3-4.

On June 3, 2021, Dezmen urinated and defecated on himself, the floor of his cell, and "everywhere" within his cell, which Captain Ed Adams attributed to the medication he was prescribed for constipation. Plaintiff's Exhibit GG – Captain Ed Adams Recorded Interview, p. 12 and Plaintiff's Exhibit Y, Report of Investigation, p. 35. Dezmen had also ripped up toilet paper and thrown it throughout his cell. *Id.*, p. 31. Dezmen had destroyed his mat and thrown partially-eaten food around his cell. Plaintiff's Exhibit II – Marlo Carter Recorded Interview, p. 2.

Adams prepared to bring him to the shower, and asked for help from Chief Joseph Deputy Gorman. Plaintiff's Exhibit Y, Report of Investigation, p. 30. When taking Dezmen to the shower, Gorman observed that Dezmen was "dizzy" "stumbling," and could not walk straight. Plaintiff's Exhibit HH, Chief Deputy Joseph Gorman Recorded Interview, 2:13-15, 5:1-3. Dezmen was naked, having apparently removed his clothes. *Id.*, p. 4. Gorman stated the only item of clothing in his cell was a suicide suit, which he was told Dezmen was given because he kept removing his clothes. *Id.*, p. 8.

Gorman described him as acting like someone who did not know where he was at, "fine in this one second and ten seconds later… a completely different person," "yelling, screaming for no reason." *Id.*, p. 4. On the way to the shower, Dezmen said repeatedly, "I need help, I need help,"

but did not respond when Gorman asked him what kind of help he needed. *Id.*, p. 7. Once he got

to the shower, Dezmen stopped talking and stood under the hot water. *Id.*

On his way to the shower, Dezmen took a piece of paper off a countertop as they walked

by and threw it on the floor, for no apparent purpose. *Id.*, p. 2. Dezmen couldn't open his left eye

as it was swollen and completely shut. *Id.*, p. 3, 5.

Another detainee, Marlo Carter, who was Dezmen's uncle, cleaned Dezmen's cell while

he was in the shower. Plaintiff's Exhibit Y, Report of Investigation, p. 34-35. Carter testified that

Dezmen had been beating on the door of his cell, asking for help, screaming that his brain was

bleeding. Plaintiff's Exhibit II, Marlo Carter Interview, p. 5.

9.      At about 6 p.m. on Friday, June 4, 2021, the nurse on duty at the jail interacted with

Mr. McBride at evening pill call. Mr. McBride was lying on mat on the floor of his cell. He was

"verbally responsive with sometimes mumbling." There was no acute distress noted and the nurse

recommended for Mr. McBride to remain in the booking area for monitoring by the security staff.

**RESPONSE**: Denied. Admitted only that this is the statement made by the county's expert,

Dr. Fowlkes in his affidavit. For the Court's convenience, it is Exhibit 3, p. 6 at 9.

Plaintiff admits that Dezmen, an eighteen-year old male who had no significant medical

history prior to admission to Brassell, died less than 24 hours after a nurse observed he was in no

acute distress. Defendants' Statement of Undisputed Material Facts, No. 1 and 17.

The full picture is that Lt. Samuel Baker worked Friday, June 4, 2021, and Saturday, June

5, 2021. Plaintiff's Exhibit JJ, Lt. Samuel Baker Recorded Interview, 2:20-23. When Baker began

working his shift on Friday, June 4, 2021, Dezmen had on his jumpsuit and boxers and a blanket.

*Id.*, p. 7:25-30. He was not provided a mattress because he had destroyed a mattress the previous

day. *Id.* Baker described him as "laying around" with his head covered up, as opposed to most

prisoners, who get up and walk around or look out the window. *Id.*, 8:1-6. Baker stated that he could not recall if Dezmen complained of any medical issues, though he remembered him yelling in his room, as detainees regularly did. Plaintiff's Exhibit Y, Report of Investigation, p. 39.

Baker couldn't recall if Dezmen was seen by a nurse. Plaintiff's Exhibit JJ, Baker Interview, 9:1-11. Baker couldn't recall Dezmen complaining about any medical issues on Friday, June 4. *Id.*, 2:18-21.

10.     On Saturday morning, June 5, 2021, Mr. McBride was evaluated by the nurse on duty at the jail during morning pill call. Mr. McBride was uncooperative and complained of having been hit in the eye. The nurse communicated with the security staff on duty and arranged for Mr. McBride to be given a sandwich. She also communicated with the nurse who would be on duty later in the day to re-evaluate Mr. McBride and check on his oral intake. Ex. 2 & 3.

**RESPONSE**: Admitted.

11.     On the morning of June 5, 2021, the security staff, including Lt. Samuel Baker, performed welfare checks on McBride. McBride's cell was in disarray. Mr. McBride was given a shower while his cell was cleaned. Mr. McBride was unable or unwilling to walk unassisted and was taken to the shower by Lt. Baker and another detainee who was related to Mr. McBride. Ex. 2 & 3.

**RESPONSE**: Denied. Admitted only that Baker stated food, food trays, and a destroyed mattress were thrown around in Dezmen's cell when he reported to work on the morning of June 21, 2021. Plaintiff's Exhibit V, Summary of Investigation, p. 11. Admitted that Dezmen told Baker and Marlo Carter that he could not stand or walk. *Id.*, p. 12.

The full story is that Lt. Baker went to Marlo Carter's cell and told him that Dezmen didn't smell good and needed a shower. Plaintiff's Exhibit II, Marlo Carter Interview, p. 15.

Lt. Baker knew that Dezmen had been in a fight and that he was transported to the hospital with complaints of chest pain and headaches, as these incidents were documented in the briefing notes from shifts on June 1 and June 2. Plaintiff's Exhibit B, Baker Deposition, p. 103:25-104:20 and Plaintiff's Exhibit KK, Brassell Detention Center Briefing Notes, p. 3-4. Lt. Baker believed at the time that Dezmen was on a suicide watch based on notes from previous shifts. *Id*., 197:3-20.

On June 5, 2021, Dezmen was laying on the concrete floor by the door to his cell, naked, without a blanket over him. Plaintiff's Exhibit II, Carter Interview, 16:20-30. His jumpsuit and blanket had been ripped up and thrown around his cell. *Id*., p. 16. His food trays were all over the room and there was water on the floor. *Id*. Dezmen asked for help and said he needed a shower. *Id*., p. 16-17. Dezmen said he could not stand up, and when Carter tried to lift him off the floor, Dezmen urinated all over him. *Id*., p. 18. Carter jumped back, letting go of Dezmen; he stood upright on his own for three or four seconds, then collapsed onto the concrete floor. *Id*., p. 18.

Because Dezmen could not walk or stand, Carter grabbed his arms and pulled him naked across the floor, through the prison to the shower area. *Id*. When he grew tired from pulling him, about halfway to the shower, he stopped, and Baker began to help him, each of them taking one of Dezmen's arms and pulling him. *Id*. and Plaintiff's Exhibit JJ, Baker Interview, p. 9.

See video footage of Lt. Baker and Carter dragging Dezmen naked through the prison at Plaintiff's Exhibit QQ, starting at 7:15, and Plaintiff's Exhibit RR, starting at 33:15.

In the shower, Dezmen complained about his arms and legs hurting. *Id*., p. 19. He could not bathe himself and asked Carter to wash him. *Id*. Carter initially refused, and he and Baker "cracked a joke about" Dezmen's request. *Id*. Carter finally agreed to wash him. *Id*. Dezmen told him the water was helping his left eye, which had Carter observed was "crusted up" and looked

like it hadn't been open for days. *Id*., p. 2 and 18. Dezmen asked Carter to leave him in the shower, and Carter returned to his cell and cleaned it. *Id*.

Carter returned to the shower area and tried to hand Dezmen a towel; he was shaking "so bad" and his fingers were locked up and curved in, so he could not hold it. *Id*., p. 20. He told Carter he was trying to wipe his own eye and could not. *Id*. Carter wiped his eye for him. *Id*. Dezmen could not stand, and he laid flat on the shower floor the entire time, rolling at one point from his stomach to his side. *Id*.

Carter estimated Dezmen's shower lasted twenty or thirty minutes. *Id*. Lt. Baker estimated it lasted at least twenty minutes. Plaintiff's Exhibit JJ – Baker Interview, p. 14.

Lt. Baker told Carter they had to get Dezmen back into his cell so he could do his logs and paperwork. Plaintiff's Exhibit II, Carter Interview, 20:9-13. Carter told Dezmen they were bringing up back to his cell, and advised him to stop ripping up his belongings or the staff in the detention center would start charging him for it. *Id*. Dezmen got angry and started cursing "out of nowhere." *Id*. Carter stood him up, encouraging him to walk back to his cell by himself, but he slid down the shower wall until he was on the floor again. *Id*. Baker and Carter dragged him back from the shower to his cell. *Id*., 20-21.

Carter again pulled Dezmen, naked, from the shower, with Baker arriving to help him by grabbing his other arm. *Id*., p. 21 and Plaintiff's Exhibit JJ, Baker Interview, p. 9, Plaintiff's Exhibit QQ, starting at 7:15, and Plaintiff's Exhibit RR, starting at 33:15.

Baker gave him underwear and a blanket and left him in his cell. *Id*. Dezmen put his underwear on and laid under his blanket, appearing to be asleep. *Id*., p. 2.

Throughout, Dezmen continually asked for help, and told Carter to call his mother and to have her call Dezmen's mother to help him. Plaintiff's Exhibit II, Carter Interview, p. 21-22. Carter

responded that he was trying to help by showering him and cleaning his cell, but "ain't nothing else I can do, because I'm -- I'm a detainee, Nephew." *Id*., 22:25-26.

12.     Mr. McBride was returned to his holding cell in the booking area after his shower and regular welfare checks were continued. Lunch was served at approximately 10:30 a.m. Shortly thereafter on another welfare check, Lt. Baker noted that Mr. McBride was having difficulty breathing and was spitting on the floor. Ex. 2 & 3.

**RESPONSE**: Denied. Lt. Baker reported that it was more than having difficulty breathing, instead that Dezmen was largely unresponsive and drooling, with a "whole bunch" of saliva puddled on the floor next to his head. Plaintiff's Exhibit NN, Baker Initial Interview p. 2.

Lt. Baker admitted that it was at least two hours from the time he dragged Dezmen naked to and from the shower, to when he called the nurse to report that Dezmen needed medical assistance. Plaintiff's Exhibit JJ, Baker Interview, 11:4-18. At no point in those hours did Lt. Baker call a nurse, an ambulance, or a supervisor to report that Dezmen could not stand or walk and that he was asking for help. *Id*. and Plaintiff's Exhibit Y. Instead, Lt. Baker dragged Dezmen naked through the prison and then left him alone in his cell to write his reports and do his other duties. *Id*.

When asked why he didn't call for help when he knew Dezmen could not stand or walk, Baker initially said he didn't think it was serious" as "most of the time [detainees will] lay there and they get stiff, they can't walk and stuff like that." Plaintiff's Exhibit JJ, 12:24-27.

During JCSO's investigation into Dezmen's death, Lt. Samuel Baker was found to have knowingly violated policies and procedures by failing to advise the staff of Dezmen's medical issues "prior to placing him in the shower and after." Plaintiff's Exhibit V, Summary of

Investigation, p. 26. He was suspended for three days, two of which were suspended, so he served only one day without pay. Plaintiff's Exhibit LL, IAB Findings on Officers, p. 2.

13.    Lt. Baker called the jail nurse regarding Mr. McBride's symptoms and erratic behavior. The nurse recommended Mr. McBride to be transported to the hospital again for evaluation. Ex. 2 & 3.

**RESPONSE**: Admitted that Baker called the nurse at around 11am on June 5, 2021, according to the nurse's contemporaneous notes. Plaintiff's Exhibit OO – Nurse's Notes from June 2, 2021 through June 5, 2021, p. 7. At least two hours after dragging Dezmen naked back to his cell because he could not walk or stand, Lt. Baker finally called a nurse and reported Dezmen's symptoms. Plaintiff's Exhibit B, Baker Deposition, 88:24-89:13. Baker testified that when he returned to Dezmen's cell and saw him drooling, Dezmen asked Baker for help. Plaintiff's Exhibit MM, Baker Incident Report, p. 3. Baker called the nurse and she advised Baker to have him transported to the hospital. *Id*.

14.    Lt. Baker requested emergency medical services (EMS) for Mr. McBride at 11:06a.m. Several minutes later EMS arrived. EMS personnel found Mr. McBride to be alert but with an altered mental status, incontinent of urine, and uncooperative. He was yelling at EMS personnel. Ex.2 & 3.

**RESPONSE**: Admitted. Dezmen did not respond to paramedics when they asked his name, and when they placed him on the stretcher, he asked where he was going. Plaintiff's Exhibit Y, Report of Investigation, p. 43. Lt. Baker handcuffed Dezmen and placed him in leg restraints while he was on the stretcher, even though he knew that Dezmen could not walk or stand. *Id*., p. 44. When paramedics put a mask on Dezmen, he began yelling that he did not want a mask on his face. *Id*. It took eight to ten minutes for Deputy Anderson to arrive at the hospital so that the

ambulance could transport Dezmen to Jefferson Regional Medical Center (the ambulance could not leave without a deputy accompanying it). *Id*., p. 44.

15.    Mr. McBride was taken to the ambulance and was placed on a cardiac monitor. He was found to have a heart rate of over 200 with systolic BP of over 200. His Sa02 was 98%. Ex. 2& 3.

**RESPONSE**: Admitted.

16.    Mr. McBride began to complain of difficulty breathing. He suddenly became apneic and pulseless at approximately 11:35 a.m. Advanced cardiac life support was begun for his cardiac arrest and he was transported to JRMC. His cardiac rhythm enroute was pulseless electrical activity(PEA). Ex. 2 & 3.

**RESPONSE**: Admitted.

17.    Mr. McBride arrived back at the JRMC ED at 12:04 p.m. on 6/5/2021. This ED encounter was significant for:

   a.   Initial cardiac rhythm at the hospital was asystole. He had a normal body temperature.

   b.   Resuscitation was continued in the ED but was unsuccessful.

   c.   He was pronounced deceased at 12:18 p.m. on 6/5/2021. The coroner was notified.

   d.   The final ED diagnosis was malignant ventricular arrhythmias. Ex. 2 & 3.

**RESPONSE**: Admitted.

18.    An autopsy performed on 6/7/2021 at the Arkansas State Crime Laboratory was significant for:

   a.   There was no significant trauma.

b.  There was an 8 cm x 4 cm contusion of the left forehead. However, there was no underlying hematoma formation or skull fracture.

c.  Internal examination was normal without evidence of any internal trauma or pathology of the organs.

d.  The gastrointestinal tract did not show any abnormalities. There was no evidence of any gastrointestinal bleeding. There was no mention of constipation or increased stool in the colon.

e.  On post-mortem examination Mr. McBride's skull, brain, and central nervous system were normal. He did not have intracranial bleeding, cerebral edema nor any other intracranial injury, pathology, or abnormality. The microscopic exam of brain tissue likewise did not show evidence of hemorrhage, inflammation, or other abnormality.

f.  Vitreous electrolyte testing was unremarkable and toxicology testing was negative aside from a small amount of cannabinoid metabolites in the blood. (N.B. Naloxone was also present but was likely administered during the resuscitation efforts.) A COVID test did not give valid results.

g.  Because "there are no specific findings at autopsy which can account for Mr. McBride's death," the cause of death was ruled undetermined and the manner also undetermined. Ex. 2 & 3.

**RESPONSE**: Denied.  Defendant's list in Request No. 18 is a selective, misleading, and incomplete picture of the autopsy findings. Their list leaves out that the autopsy found that that was a "subgaleal contusion" to Mr. McBride's head, that there was not a finding of "significant trauma" and instead that there was no evidence at the time of the autopsy of "acute life-threatening

injury," and not that he "did not have intracranial bleeding," just that there was none present at the time of the autopsy.  Ex. 2 & 3.

Further, Plaintiff's expert reported that there were worsening symptoms of intracranial pressure, and has attributed his death to the head trauma he suffered in the altercation on June 1, 2021, and the failure to provide him appropriate medical care when his condition worsened after he was discharged from the hospital on June 2, 2021.  Plaintiff's Exhibit Z, Record Review and Opinion of Dr. William Rutledge.

### Supervision

19.    In light of the size of the Jefferson County's Sheriff's Department (including the detention center) necessarily delegate responsibility for most day-to-day activities to subordinate officers through a chain of command in each division. Those officers are expected to perform those day-to-day tasks pursuant to policies Sheriff Woods implemented for the department. This chain of command, in addition to other mechanisms like camera systems, post-incident investigations, and other mechanisms, also provides for the comprehensive supervision of jail employees. Ex. 2.

**RESPONSE**: Denied.  Any supposed mechanisms for "comprehensive supervision of jail employees" were completely undercut and thus not comprehensive by the fact that Defendant continued to employ an officer who was fired three times for use of force and dishonesty; decertified as a law enforcement officer at former Sheriff Robinson's request; videotaped punching a detainee in the face twelve times, breaking his bones and teeth; and videotaped dragging a naked, medically distressed detainee (Plaintiff) through the jail before returning him to his cell, and waiting over two hours before calling for medical help.  Plaintiff's Exhibits C, E, F, I, J, and Y.

**Training**

20.     During Dezmen McBride's incarceration in May and June of 2021, jail staff at the Jefferson County jail was trained under a comprehensive training system that met or exceeded the requirements of state law. This training included jail standards training, medical and emergency response training, training in the use of force, training in the policies of the jail, and training on recognizing and reporting medical problems to the jail medical staff and/or emergency medical responders. Ex. 2.

**RESPONSE**:  Denied. Any supposed "system" of training was completely undercut and thus not a system by their custom and practice of continuing to employ a decertified officer who was fired three times for use of force and dishonesty; decertified as a law enforcement officer at former Sheriff Robinson's request; videotaped punching a detainee in the face twelve times, breaking his bones and teeth; and videotaped dragging a naked, medically distressed detainee (Plaintiff) through the jail before returning him to his cell, and waiting over two hours before calling for medical help.  Plaintiff's Exhibits C, E, F, I, J, and Y.  Defendant was negligent in its retention, training, and supervision of Lt. Baker, having a custom and practice of allowing him to run wild.  Plaintiff's Exhibits L, M, N, V, and Y.

**Medical Staffing and Care**

21.     Prior to decedent Dezmen McBride's 2021 incarceration, the County had employed a local physician, along with several nurses, to manage jail medical care at the county jail. Dezmen McBride was under the medical staff's care throughout his 2021 incarceration and the jail staff relied upon their judgment in his care and treatment. Jail medical staff was certainly expected to watch detainees closely in the days following their return from any visit(s) to the hospital and jail staff would be expected to coordinate with the medical staff. Ex. 2.

**RESPONSE**: Denied.  Whether "jail medical staff" would "be expected' to do something is a question of fact and not policy. In this case, the jail medical staff was not notified of the extreme condition of Dezmen McBride until it was too late. Plaintiff's Exhibit V.

Admitted however that there was a nurse and physician employed by the jail. Also admitted that it was the County Defendants' responsibility to ensure Plaintiff and other detainees were provided the constitutionally appropriate level of care.

22.     The jail physician and nursing staff provided full-service medical care for all of the detainees in the Jefferson County Detention Center (including Dezmen McBride), including physician and nursing care, medication prescription and management, and medical referrals when medically indicated. Additionally, jail staff had full latitude (which they frequently used, including in Dezmen McBride's case) to call for an ambulance, transport to the emergency room, or seek any other emergence medical care. Ex. 2.

**RESPONSE**: Denied. Admitted that the jail physician and nursing staff existed and provided some care to detainees. Denied that County Defendants or any medical staff employed by the County Defendants in the prison took the appropriate measures to supervise McBride or to provide him the care he required to prolong his life. Plaintiff's Exhibit V, Summary of Investigation.

Specifically, Nurse Lanetra Evans-Shelton was found to have violated JCSO policies and procedures by failing to administer Dezmen McBride the medicine he was prescribed by JCSO, instead leaving it with Lt. DeBerry to be administered. *Id*., p. 26. IAB recommended a written warning, however Evans-Shelton was on administrative leave at the time, so no action was taken. *Id*. and Plaintiff's Exhibit LL, IAB Findings Against Officers, p. 6.

23.     During Dezmen McBride's incarceration in May and June of 2021, Jefferson County had constitutionally appropriate policies in place to govern the use of force by jail officers and the provision of medical care to detainees. Ex. 2.

**RESPONSE**: Denied.  Insofar as their policies, Plaintiff alleges that they had a custom and practice that was contrary to their written policies. Admitted however that written policies existed. Denied that the County Defendants enforced these policies in any meaningful way, as evidenced by the fact that they continued to employ an officer who was fired three times for use of force and dishonesty; decertified as a law enforcement officer at former Sheriff Robinson's request; videotaped punching a detainee in the face twelve times, breaking his bones and teeth; and videotaped dragging a naked, medically distressed detainee (Plaintiff) through the jail before returning him to his cell, and waiting over two hours before calling for medical help.  Plaintiff's Exhibit C, E, F, I, J, and Y.

24.     Jefferson County is (and has been, for many years) a member of the Association of Arkansas Counties Risk Management Fund, but that membership provides no coverage for negligence or negligent conduct of any kind, including but not limited to medical negligence/malpractice. Ex. 1 & 2.

**RESPONSE**: Admitted.  The Risk Management fund does not cover negligence, but Plaintiff has sued for intentional torts which are specially included in the list of items that the Risk Management provides coverage for.  *Plaintiff's Exhibit A.*

Further, Plaintiff has not brought a claim for medical negligence.

Respectfully submitted,

**TANARIA HEARD, individually and as Special Administrator of the Estate of Dezmen McBride, PLAINTIFF**

WH Law | We Help
1 Riverfront Pl. – Suite 745
North Little Rock, AR 72114
(501) 891-6000

By:    Chris Burks (ABN: 2010207)
       chris@wh.law