IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

TANARIA HEARD, individually and as
Special Administrator of the Estate of
Dezmen McBride                                                    PLAINTIFF

v.                                    Case No. 4:24-cv-00325 KGB

ASSOCIATION OF ARKANSAS
COUNTIES RISK MANAGEMENT
FUND, *et al.*                                                    DEFENDANTS

<u>OPINION AND ORDER</u>

Before the Court are a motion for summary judgment filed by separate defendant Lieutenant Samuel Baker, Jr., in his individual capacity, and a motion for summary judgment filed by separate defendants Jefferson County, Arkansas; the Association of Arkansas Counties Risk Management Fund ("AACRMF"), Lieutenant Samuel Baker, Jr., in his official capacity; and Sheriff Lafayette Woods, Jr., in his official capacity (collectively "County Defendants") (Dkt. Nos. 34; 36). Plaintiff Tanaria Heard responded in opposition to the motions (Dkt. No. 47; 50). Lieutenant Baker and County Defendants replied (Dkt. Nos. 52; 53). For the following reasons, the Court grants, in part, and denies, in part, Lieutenant Baker and County Defendants' motions for summary judgment (Dkt. Nos. 34; 36).

I.      Factual Background

Unless otherwise specified, the Court draws the following facts from County Defendants' statement of indisputable material facts in support of motion for summary judgment, Lieutenant Baker's statement of facts not in dispute for purposes of summary judgment, and Ms. Heard's responses to those statements (Dkt. Nos. 39; 37; 46; 49). Ms. Heard also submitted without

objection video footage of some of these events which the Court has reviewed in its entirety (Dkt. No. 48).

### A.    County Defendants' Undisputed Facts

### 1.    Mr. McBride's Incarceration In Jefferson County

It is undisputed that, prior to his incarceration in May and June 2021, Mr. McBride had a past medical history significant only for several episodes of sexually transmitted infection ("STI") (Dkt. No. 46, ¶ 1).  During those treatment encounters, he reported no past medical history (*Id.*). Mr. McBride's vital signs and physical exam were unremarkable at those encounters (*Id.*).

On May 21, 2021, Mr. McBride was transported to the Dub Brassell Detention Center ("Brassell Detention Center") in Jefferson County from the Pulaski County Detention Center (*Id.*, ¶ 2).  It is undisputed that on May 31 and/or June 1, 2021, Mr. McBride was involved in an altercation(s) with other inmates (*Id.*, ¶ 3).  County Defendants claim that at least one of these altercations involved Mr. McBride being struck near his left eye and involved Mr. McBride head-butting another inmate (*Id.*).  Ms. Heard claims that it is disputed whether Mr. McBride headbutted another inmate during the referenced altercations (*Id.*).

According to County Defendants, the Brassell Detention Center sergeant who reported the altercation(s) consulted with the Brassell Detention Center nurse, and a decision was made to transport Mr. McBride to the hospital for evaluation (*Id.*, ¶ 4).  It is only undisputed that the Brassell Detention Center sergeant witnessed the altercation, and with citation to record evidence, Ms. Heard denies the remainder of this statement (*Id.*).

It is undisputed that, at approximately 10:55 p.m. on June 1, 2021, Mr. McBride was transported to the Jefferson Regional Medical Center ("JRMC") by transport deputy (*Id.*, ¶ 5). That emergency department visit was significant for:

a.  Upon triage Mr. McBride was complaining of a headache and nausea/vomiting which he said began at 6:00 a.m.  He also reported that he was "hit in the head yesterday" and was vomiting blood or coffee ground emesis today (*Id.*).

b.  His initial vital signs were: temperature ("T")= 98.4, pulse ("P")= 84, respirations ("R")= 18, blood pressure ("BP")= 92/50, oxygen saturation ("Sa02")= 100% (*Id.*).

c.  Mr. McBride told the emergency department physician that his symptoms began "after dinner."  There was no known precipitating event, but Mr. McBride did report being hit in the head yesterday.  He did not have any loss of consciousness (*Id.*).

d.  On review of systems, Mr. McBride had no other complaints.  He denied constipation as well as any cardiac or respiratory symptoms.  He admitted to smoking daily but denied drug or alcohol use (*Id.*).

e.  His physical exam was significant for diaphoretic skin, pain of 5/10, and a diffusely tender abdomen with guarding (*Id.*).

f.  A computerized tomography ("CT") scan of his head done STAT due to the headache and nausea/vomiting showed no intracranial hemorrhage and no cerebral edema or mass effect.  No acute intracranial abnormality was found (*Id.*).

g.  Abdominal x-rays showed no bowel obstruction or other acute intra-abdominal process.  There was scattered gas and fecal material throughout the colon.  In addition, his heart size was normal, and the lungs were clear with no acute pulmonary process (*Id.*).

h.  Lab tests showed a normal hematocrit and hemoglobin indicating no anemia or significant blood loss, a negative COVID test, a comprehensive metabolic panel

with unremarkable results, a normal urinalysis aside from 1+ ketones, normal white

blood cell count indicating no infection, and normal amylase and lipase (*Id.*).

i.    Mr. McBride was given intravenous fluids in the emergency department along with

a dose of pain medication and Zofran for nausea.  He was also dispensed a bottle

of magnesium citrate to drink for constipation.  Mr. McBride apparently did not

drink the magnesium citrate in the emergency department, but he brought it back

with him to the Brassell Detention Center upon discharge (*Id.*).

j.    Mr. McBride was improved in the emergency department.  Vital signs on discharge

were:  P= 79, BP= 127/70, and Sa02= 100% (*Id.*).

k.    Mr. McBride was discharged into the custody of the Jefferson County Sheriff's

Office ("JCSO") deputy at 1:30 a.m. on June 2, 2021.  His final emergency

department diagnoses were:  headache and constipation.  He was given standard

discharge instructions for constipation.  He was sent back to the jail with a

prescription for Zofran as needed for nausea and dietary instructions for 24 hours.

The emergency department physician did not believe physician follow-up was

required (*Id.*).

Further, it is undisputed that, on the morning of Wednesday, June 2, 2021, the nurse on

duty at the Brassell Detention Center spoke with Mr. McBride's mother about his condition and

evaluated Mr. McBride (*Id.*, ¶ 6).  Mr. McBride reported:  "They jumped on me and hit me in my

eye.  I want to go back to the back.  I know I asked to come up here[,] but now I want to go to the

back." (*Id.*).  On the morning of June 3, 2021, the nurse on duty at the Brassell Detention Center

received the magnesium citrate which had been sent back from the emergency department (*Id.*, ¶

7).  The nurse attempted to administer the medication during morning pill call, but Mr. McBride

was asleep; the nurse left the laxative with the security staff for Mr. McBride to drink once he was awake (*Id.*).    On Thursday, June 3, 2021, the nurse on duty at the Brassell Detention Center interacted with Mr. McBride, who requested a shower (*Id.*, ¶ 8).    According to County Defendants, the nurse relayed this request to the security staff, and Mr. McBride cleaned his cell, showered, and was noted to be in no distress (*Id.*).    It is only undisputed that the nurse testified that Mr. McBride asked for a shower, and Ms. Heard denies the remainder of this statement (*Id.*).

According to County Defendants, at about 6:00 p.m. on Friday, June 4, 2021, the nurse on duty at the Brassell Detention Center interacted with Mr. McBride at evening pill call (*Id.*, ¶ 9). County Defendants further contend that Mr. McBride was lying on a mat on the floor of his cell; was "verbally responsive with sometimes mumbling"; and that there was no acute distress noted; the nurse recommended for Mr. McBride to remain in the booking area for monitoring by the security staff (*Id.*).    Ms. Heard denies this and claims that this is the statement made by County Defendants' expert Dr. Fowlkes (*Id.*).

It is undisputed that, on the morning of Saturday, June 5, 2021, Mr. McBride was evaluated by the nurse on duty during morning pill call (*Id.*, ¶ 10).    Mr. McBride was uncooperative and complained of having been hit in the eye (*Id.*).    The nurse communicated with the security staff on duty and arranged for Mr. McBride to be given a sandwich (*Id.*).    She also communicated with the nurse who would be on duty later in the day to re-evaluate Mr. McBride and check on his oral intake (*Id.*).

According to County Defendants, on the morning of June 5, 2021, the security staff, including Lieutenant Baker, performed welfare checks on Mr. McBride (*Id.*, ¶ 11).    County Defendants contend that Mr. McBride's cell was in disarray; that Mr. McBride was given a shower while his cell was cleaned; and that Mr. McBride was unable or unwilling to walk unassisted and

was taken to the shower by Lieutenant Baker and another inmate who was related to Mr. McBride (*Id.*). In response, Ms. Heard admits only that Lieutenant Baker stated that food, food trays, and a destroyed mattress "were thrown around in [Mr. McBride's] cell" and that Mr. McBride told Lieutenant Baker and Detainee Marlo Carter[1] ("Detainee Mr. Carter") that Mr. McBride could not stand or walk (*Id.*). Ms. Heard denies the remainder of this statement.

County Defendants claim that Mr. McBride was returned to his holding cell in the booking area after his shower, and regular welfare checks were continued (*Id.*, ¶ 12). Further, County Defendants maintain that lunch was served at approximately 10:30 a.m. and that, shortly thereafter, on another welfare check, Lieutenant Baker noted that Mr. McBride was having difficulty breathing and was spitting on the floor (*Id.*).

Ms. Heard denies this, and with citation to record evidence, claims that "Lieutenant Baker reported that it was more than having difficulty breathing, instead that [Mr. McBride] was largely unresponsive and drooling, with a 'whole bunch' of saliva puddled on the floor next to his head." (*Id.*). Ms. Heard further claims, with citation to record evidence, that Lieutenant Baker admitted that it was at least two hours from the time he dragged Mr. McBride naked to and from the shower, to when Lieutenant Baker called the nurse to report that Mr. McBride needed medical assistance (*Id.*). According to Ms. Heard, at no point in those hours did Lieutenant Baker call a nurse, an ambulance, or a supervisor to report that Mr. McBride could not stand or walk and that he was asking for help (*Id.*). Ms. Heard claims that instead, Lieutenant Baker dragged Mr. McBride naked through the prison and then left Mr. McBride alone in his cell so that Lieutenant Baker could write his reports and do his other duties (*Id.*). When asked why he did not call for help when he knew

---

[1]    The record evidence is that Detainee Marlo Carter, a trustee at the Brassell Detention Center, is Mr. McBride's uncle (Dkt. No. 49, ¶ 28).

6

that Mr. McBride could not stand or walk, Lieutenant Baker initially said that he did not think it was "serious" as "most of the time [detainees will] lay there and they get stiff, they can't walk and stuff like that." (*Id.*; Dkt. No. 46-37, at 13).

It is undisputed that Lieutenant Baker called the Brassell Detention Center nurse regarding Mr. McBride's symptoms and erratic behavior (Dkt. No. 46, ¶ 13). The nurse recommended that Mr. McBride be transported to the hospital again for evaluation (*Id.*). Ms. Heard, with citation to record evidence, supplements this statement.

Lieutenant Baker requested emergency medical services ("EMS") for Mr. McBride at 11:06 a.m. (*Id.*, ¶ 14). Several minutes later EMS arrived (*Id.*). EMS personnel found Mr. McBride to be alert but with an altered mental status, incontinent of urine, and uncooperative (*Id.*). He was yelling at EMS personnel (*Id.*). Mr. McBride was taken to the ambulance and was placed on a cardiac monitor (*Id.*, ¶ 15). He was found to have a heart rate of over 200 with systolic BP of over 200 (*Id.*). His Sa02 was 98% (*Id.*). Mr. McBride began to complain of difficulty breathing (*Id.*, ¶ 16). He suddenly became apneic and pulseless at approximately 11:35 a.m. (*Id.*) Advanced cardiac life support was begun for his cardiac arrest, and he was transported to JRMC (*Id.*). His cardiac rhythm enroute was pulseless electrical activity ("PEA") (*Id.*). Mr. McBride arrived back at the JRMC emergency department at 12:04 p.m. on June 5, 2021 (*Id.*, ¶ 17). This emergency department encounter was significant for:

    a.    Initial cardiac rhythm at the hospital was asystole. He had a normal body temperature (*Id.*).

    b.    Resuscitation was continued in the emergency department but was unsuccessful (*Id.*).

     c.      He was pronounced deceased at 12:18 p.m. on June 5, 2021. The coroner was notified (*Id.*).

     d.      The final emergency department diagnosis was malignant ventricular arrhythmias (*Id.*).

County Defendants claim that an autopsy performed on June 7, 2021, at the Arkansas State Crime Laboratory was significant for:

     a.      There was no significant trauma (*Id.*, ¶ 18).

     b.      There was an 8 cm x 4 cm contusion of the left forehead. However, there was no underlying hematoma formation or skull fracture (*Id.*).

     c.      Internal examination was normal without evidence of any internal trauma or pathology of the organs (*Id.*).

     d.      The gastrointestinal tract did not show any abnormalities. There was no evidence of any gastrointestinal bleeding. There was no mention of constipation or increased stool in the colon (*Id.*).

     e.      On post-mortem examination, Mr. McBride's skull, brain, and central nervous system were normal. He did not have intracranial bleeding, cerebral edema nor any other intracranial injury, pathology, or abnormality. The microscopic exam of brain tissue likewise did not show evidence of hemorrhage, inflammation, or other abnormality (*Id.*).

     f.      Vitreous electrolyte testing was unremarkable, and toxicology testing was negative aside from a small amount of cannabinoid metabolites in the blood. (N.B. Naloxone was also present but was likely administered during the resuscitation efforts.) A COVID test did not give valid results (*Id.*).

g.     Because "there are no specific findings at autopsy which can account for Mr. McBride's death," the cause of death was ruled undetermined and the manner also undetermined (*Id.*).

Ms. Heard, with citation to record evidence, disputes County Defendants' representations about the results of Mr. McBride's autopsy (*Id.*). Ms. Heard claims that County Defendants' list of the autopsy results is a selective list, misleading list, and an incomplete picture of the autopsy findings (*Id.*). According to Ms. Heard, County Defendants' list leaves out that the autopsy found that: there was a "subgaleal contusion" to Mr. McBride's head; there was not a finding of "significant trauma" and instead that there was no evidence at the time of the autopsy of "acute life-threatening injury"; and not that he "did not have intracranial bleeding," just that there was none present at the time of the autopsy (*Id.*). Further, Ms. Heard represents that her expert reported that there were worsening symptoms of intracranial pressure and has attributed his death to the head trauma Mr. McBride suffered in the altercation on June 1, 2021, and the failure to provide Mr. McBride appropriate medical care when his condition worsened after he was discharged from the hospital on June 2, 2021 (*Id.*).

### 2.     Supervision

County Defendants claim that in the light of the size of the Jefferson County Sheriff's Department (including the Brassell Detention Center), it necessarily delegates responsibility for most day-to-day activities to subordinate officers through a chain of command in each division (*Id.*, ¶ 19). County Defendants further claim that those officers are expected to perform those day-to-day tasks pursuant to policies Sheriff Woods implemented for the department (*Id.*). According to County Defendants, this chain of command, in addition to other mechanisms like camera systems, post-incident investigations, and other mechanisms, also provides for the comprehensive

supervision of the Brassell Detention Center employees (*Id.*). Ms. Heard, with citation to record evidence, denies these claims (*Id.*). According to Ms. Heard any alleged mechanisms for supervision were completely undercut and thus not comprehensive by the fact that County Defendants continued to employ an officer who was fired three times for use of force and dishonesty; decertified as a law enforcement officer at former Sheriff Robinson's request; videotaped punching a detainee in the face twelve times, breaking his bones and teeth; and videotaped dragging a naked, medically distressed detainee (Mr. McBride) through the Brassell Detention Center before returning him to his cell, and waiting over two hours before calling for medical help (*Id.*, ¶ 19).

### 3. Training

County Defendants further claim that, during Mr. McBride's incarceration in May and June 2021, jail staff at the Brassell Detention Center were trained under a comprehensive training system that met or exceeded the requirements of state law (*Id.*, ¶ 20). According to County Defendants, this training included jail standards training, medical and emergency response training, training in the use of force, training in the policies of the jail, and training on recognizing and reporting medical problems to the jail medical staff and/or emergency medical responders (*Id.*).

Ms. Heard denies these claims, and asserts, with citation to record evidence, that any alleged mechanisms for training were completely undercut and thus not comprehensive by the fact that County Defendants continued to employ an officer who was fired three times for use of force and dishonesty; decertified as a law enforcement officer at former Sheriff Robinson's request; videotaped punching a detainee in the face twelve times, breaking his bones and teeth; and videotaped dragging a naked, medically distressed detainee (Mr. McBride) through the Brassell

Detention Center before returning him to his cell, and waiting over two hours before calling for medical help (*Id.*, ¶ 20). Ms. Heard asserts, with citation to record evidence that County Defendants were "negligent" in "retention, training, and supervision of [Lieutenant] Baker, having a custom and practice of allowing him to run wild." (*Id.*).

### 4.  Medical Staffing And Care

It is undisputed that, prior to Mr. McBride's 2021 incarceration, the County had employed a local physician (*Id.*, ¶ 21). According to the County Defendants, the local physician and several nurses were "to manage jail medical care at the county jail." (*Id.*). County Defendants maintain that Mr. McBride was under the medical staff's care throughout his 2021 incarceration, and the Brassell Detention Center staff relied upon their judgment in his care and treatment (*Id.*). County Defendants further maintain that the Brassell Detention Center medical staff was certainly expected to watch detainees closely in the days following their return from any visit(s) to the hospital, and the Brassell Detention Center staff would be expected to coordinate with the medical staff (*Id.*). Ms. Heard denies these assertions, with citation to record evidence, and maintains that whether "jail medical staff" would "be expected' to do something is a question of fact and not policy (*Id.*). Further, according to Ms. Heard, the record reflects that the Brassell Detention Center medical staff was not notified of the extreme condition of Mr. McBride until it was too late (*Id.*).

County Defendants represent that the Brassell Detention Center physician and nursing staff provided full-service medical care for all of the detainees in the Brassell Detention Center (including Mr. McBride), including physician and nursing care, medication prescription and management, and medical referrals when medically indicated (*Id.*, ¶ 22). County Defendants also represent that, additionally, the Brassell Detention Center staff had full latitude (which they frequently used, including in Mr. McBride's case) to call for an ambulance, transport to the

emergency room, or seek any other emergency medical care (*Id.*).  Although Ms. Heard admits

that the Brassell Detention Center physician and nursing staff existed and provided some care to

detainees, she denies with citation to record evidence that County Defendants or any medical staff

employed by the County Defendants in the Brassell Detention Center took the appropriate

measures to supervise McBride or to provide him the care he required to prolong his life (*Id.*).

According to County Defendants, during Mr. McBride's incarceration in May and June

2021, Jefferson County had constitutionally appropriate policies in place to govern the use of force

by the Brassell Detention Center officers and the provision of medical care to detainees (*Id.*, ¶ 23).

Although Ms. Heard admits that written policies existed, she denies with citation to record

evidence that County Defendants enforced these policies in any meaningful way, as evidenced by

the fact that County Defendants continued to employ an officer who was fired three times for use

of force and dishonesty; decertified as a law enforcement officer at former Sheriff Robinson's

request; videotaped punching a detainee in the face twelve times, breaking his bones and teeth;

and videotaped dragging a naked, medically distressed detainee (Mr. McBride) through the

Brassell Detention Center before returning him to his cell, and waiting over two hours before

calling for medical help (*Id.*).

It is undisputed that Jefferson County is (and has been, for many years) a member of the

Association of Arkansas Counties Risk Management Fund ("AACRMF"), but such membership

provides no coverage for negligence or negligent conduct of any kind, including but not limited to

medical negligence/malpractice (*Id.*, ¶ 24).

### B.    Lieutenant Baker's Undisputed Facts

On May 29, 2020, Mr. McBride was charged with Domestic Battery I, Use of a Firearm;

Aggravated Assault; and three counts of Terroristic Act (Dkt. No. 49, ¶ 1).  Mr. McBride failed to

appear for an October 1, 2020, omnibus hearing, and the court issued a warrant (*Id.*, ¶ 2). The warrant was served on Mr. McBride on May 21, 2021, and Mr. McBride was booked into the Brassell Detention Center (*Id.*, ¶ 3).

### 1.    Events Of June 1, 2021

Lieutenant Baker claims that, on the morning of June 1, 2021, Sergeant Delucas Etherly was feeding detainees in the misdemeanor-1 pod ("MISD-1") and noticed two detainees "holding each other as if they were wrestling." (*Id.*, ¶ 4). The two detainees were Mr. McBride and detainee Wainwright (*Id.*). Lieutenant Baker claims that, while attempting to separate Mr. McBride and Mr. Wainwright, Mr. Wainwright head-butted Mr. McBride (*Id.*). Further, according to Lieutenant Baker, Sergeant Etherly ultimately separated Mr. McBride and Mr. Wainwright and asked Mr. McBride if he was okay (*Id.*). According to Lieutenant Baker, Mr. McBride stated that he was (*Id.*). Lieutenant Baker maintains that Sergeant Etherly then moved Mr. McBride to A Pod 101 ("A101") (*Id.*). Ms. Heard admits only that Sergeant Etherly witnessed the altercation between Mr. McBride and Mr. Wainwright on the morning of June 1, 2021; that the incident occurred while Sergeant Etherly was serving breakfast at approximately 4:30 a.m.; and that Sergeant Etherly separated Mr. McBride and Mr. Wainwright, moving Mr. McBride to A101 at Mr. McBride's request (*Id.*). Ms. Heard maintains, with citation to record evidence, that Sergeant Etherly did not submit a written report on the fight until June 6, 2021, the day of Mr. McBride's death and resigned rather than face further discipline (*Id.*).

It is undisputed that the shift briefing notes from June 1, 2021, state, that "Detainee McBride Misd 1 was moved to A 101 due to being Jumped." (*Id.*, ¶ 5). However, Ms. Heard maintains, with citation to record evidence, that Sergeant Etherly did not submit a written report

on the fight until June 6, 2021, the day of Mr. McBride's death and resigned rather than face further discipline (*Id.*).

Lieutenant Baker claims that approximately five to 10 minutes after placing Mr. McBride in A101, Sergeant Etherly received a buzz from the detainees in A101 advising that Mr. McBride was not feeling well (*Id.*, ¶ 6). According to Lieutenant Baker, Sergeant Etherly responded to A101 and spoke with Mr. McBride (*Id.*). Lieutenant Baker further asserts that Mr. McBride confirmed that he was not feeling well, and Sergeant Etherly identified a knot on Mr. McBride's forehead (*Id.*). Sergeant Etherly notified Brassell Detention Center Nurse LaNetra Evans-Shelton, and Nurse Evans-Shelton instructed Sergeant Etherly to send Mr. McBride to the Jefferson Regional Medical Center ("JRMC") (*Id.*). Ms. Heard, with citation to record evidence, denies this assertion and claims that Sergeant Etherly became confused in the interview about when events happened because he worked the night shift; Ms. Heard, with citation to record evidence, maintains that Mr. McBride "did not see a nurse after the fight, because there was no nurse on duty at the time" and that Mr. McBride "did not see a nurse or receive medical treatment during the day on June 1, 2021, even though the fight was documented in booking notes for the next shift" and even though other witnesses observed Mr. McBride's condition and called "like, five or six times" for a nurse (*Id.*). Ms. Heard, with citation to record evidence, maintains that, "[o]n the night of June 1, 2021, over twelve hours after the fight, [Sergeant] Etherly called the prison nurse on his cell phone and told her that [Mr. McBride] had been in an altercation and had a 'knot' on his head," with the nurse advising Sergeant Etherly to have Mr. McBride transported to the hospital (*Id.*).

It is undisputed that Nurse Evans-Shelton's notes state, "Rec'd call from Sgt. Etherly on 6-1-2 around 11:40 p.m. stating that Detainee McBride had been in an altercation and his head was

hurting. Inform Sgt. Etherly to send to JRMC ER for evaluation and treatment. Dr. Elkin informed." (*Id.*, ¶ 7).

On June 1, 2021, at 10:42 p.m., Mr. McBride was transported to JRMC emergency room by a transport deputy (*Id.*, ¶ 8).[2] The shift briefing notes from June 1, 2021, state that, "Detainee Dezmen McBride A 101 was sent to JRMC by Nurses [sic] Evans." (*Id.*, ¶ 9). During his initial assessment at 11:01 p.m. at JRMC, Mr. McBride complained of a headache, abdominal pain, nausea, and vomiting (*Id.*, ¶ 10). Mr. McBride reported that he was hit in the head the day before with no loss of consciousness and that he was vomiting blood or coffee ground emesis today (*Id.*). Mr. McBride stated that it "started after dinner this afternoon." (*Id.*) The records also indicate, however, that Mr. McBride said his symptoms began at 6:00 a.m. (*Id.*). JRMC reported that Mr. McBride presented diaphoretic and nauseated (*Id.*). Mr. McBride denied constipation and denied having any cardiovascular or respiratory symptoms (*Id.*). Mr. McBride's initial vital signs at JRMC were as follows: blood pressure 92/50, pulse 84, respirations 18, oxygen saturation 100%, and temperature 98.4 (*Id.*, ¶ 11).

Mr. McBride received a head CT at JRMC due to his reports of a headache, nausea, and vomiting, and no acute intracranial abnormality was identified (*Id.*, ¶ 12). The findings of Mr. McBride's CT were as follows:

> There is no intracranial hemorrhage, cerebral edema, or mass effect. There is no hydrocephalus. The basal cisterns are clear. There is mild mucosal thickening within the left anterior ethmoid air cells. The remaining paranasal sinuses and mastoid air cells are clear. No acute osseous abnormality is identified. Visible extra cranial soft tissues are unremarkable.

---

[2] Lieutenant Baker represents that it is unclear why there is a discrepancy in time between Nurse Evans-Shelton's notes and the shift report (Dkt. No. 37, ¶ 8 n.1). Lieutenant Baker asserts that, based on the JRMC records, it appears that Mr. McBride was transported to JRMC at 10:42 p.m. (*Id.*).

(*Id.*).

Mr. McBride's abdominal x-rays obtained at JRMC indicated non-obstructive bowel gas pattern, and no acute pulmonary process (*Id.*, ¶ 13). The findings of McBride's abdominal x-ray were as follows:

> Within the chest, the tracheobronchial tree is patent. Cardiomediastinal silhouette appears normal. Lungs are clear bilaterally. No consolidative opacity or pleural effusion. Within the abdomen, there is no significant small bowel distention. Scattered gas and fecal material seen throughout the colon. No pneumatosis or free air.

(*Id.*).

JRMC diagnosed Mr. McBride with constipation and headache, and Mr. McBride was to be given a liquid diet only for 12 hours followed by a bland diet for 24 hours (*Id.*, ¶ 14). JRMC prescribed 4 mg Zofran to take every four to six hours as needed (*Id.*). Ms. Heard admits this, but she adds, with citation to record evidence, that Mr. McBride's discharge instructions were to return immediately to the emergency department if his symptoms worsened (*Id.*). According to Ms. Heard and as supported by record evidence, Deputy Jermaine Anderson, who transported Mr. McBride to and from the emergency department, testified that Mr. McBride vomited in the car on the way to emergency department; vomited on the way back to the Brassell Detention Center after his discharge; continued to complain about head pain and nausea on the way back to the Brassell Detention Center; and said that he was afraid to fall asleep, which Deputy Anderson found "strange" (*Id.*).

Ms. Heard further claims, with citation to record evidence, that Sergeant Etherly placed Mr. McBride in a quarantine pod when he returned to the Brassell Detention Center because Sergeant Etherly observed that Mr. McBride appeared weak and complained that he did not feel well and that his head hurt (*Id.*). Ms. Heard asserts, with citation to record evidence, that Mr.

McBride made a phone call around 3:40 a.m. to the mother of Mr. McBride's young daughter and told her his head was throbbing and that he was throwing up (*Id.*).

Ms. Heard further adds with citation to record evidence that, on June 2, 2021, Mr. McBride complained to Lieutenant Darinda Smith that his head was hurting and that he could not see (*Id.*). According to Ms. Heard, Lieutenant Smith told him to report his symptoms to the nurse because they were not going to transport him back to the hospital because he had already been there and been discharged (*Id.*).

Lieutenant Baker claims that there is no evidence that Lieutenant Baker had any interactions with Mr. McBride on June 1, 2021 (*Id.*, ¶ 15). Ms. Heard, with citation to record evidence, denies this assertion (*Id.*). Ms. Heard maintains that the lieutenant on the day shift on June 1, 2021, was Lieutenant Baker (*Id.*). Lieutenant Smith noted that Lieutenant Baker did not inform her of any issues with Mr. McBride during June 1, 2021, and that nothing was noted in the briefing notes (*Id.*). Lieutenant Smith noted that it was unusual that Lieutenant Baker did not make any notes that Mr. McBride was vomiting and complaining of head pain: "I said, well, if he was having all these problems during the day shift . . . which was [Lieutenant] Baker's shift, why didn't they let one of the officers know." (*Id.*). Ms. Heard cites to record evidence that other detainees in the unit with Mr. McBride during the day on June 1, 2021, attempted repeatedly to "let one of the officers know" about Mr. McBride's condition that day but were ignored (*Id.*).

## 2.    Events Of June 2, 2021

On June 2, 2021, at 1:44 a.m., Mr. McBride returned to Brassell Detention Center from JRMC (*Id.*, ¶ 16). Initially, upon his return, Mr. McBride was placed in MISD-1 (*Id.*, ¶ 17). Later that day, Mr. McBride was moved to a booking cell (*Id.*). While Ms. Heard admits this, she also adds, with citation to record evidence, that other inmates told Captain Ed Armstrong that Mr.

McBride "was wearing his blanket as a cape, talking to himself, and acting 'crazy,'" along with kicking the door of his cell; Captain Armstrong moved Mr. McBride to the booking cell (*Id.*).

On June 2, 2021, at 4:30 p.m., Nurse Carolyn Iverson spoke with Mr. McBride during pill call, and Mr. McBride stated, "They jumped on me and hit me in the eye; I want to go back to the back, I know I asked to come up here[,] but now I want to go to the back." (*Id.*, ¶ 18). According to Nurse Iverson, Mr. McBride's mental status changed from when he was in A101 to when he was in the booking cell (*Id.*, ¶ 19). Nurse Iverson explained, "Um, the only thing I remember about him is when he came back from the back [transferred from A 101 cell to the booking cell], he was acting very different. Like, maybe he had got on some drugs from back there, or – something happened to him." (*Id.*). Describing her thought process when Mr. McBride told her that he was hit in the eye, Nurse Iverson stated, "So, I didn't know if he was, you know – if it was something that was real or imagined. I didn't know because of the state he was acting like – you know? He wasn't acting like a si – like, you know like a person that you could just, like, say, 'Well, he's telling the truth.'" (*Id.*).

Ms. Heard admits that this is Nurse Iverson's testimony, but with citation to record evidence, Ms. Heard denies the accuracy of the testimony (*Id.*). According to Ms. Heard, record evidence supports that "[a] comprehensive toxicology test was performed on Dezmen McBride's body after his death, and only cannabinoid substances were detected" and that Mr. McBride repeatedly denied taking drugs in the Brassell Detention Center (*Id.*). Further, according to Ms. Heard, Chief Deputy Joseph Gorman stated that Mr. McBride "couldn't open his left eye," and this eye was "completely shut" when he saw Mr. McBride on Thursday, June 3, 2021, contrary to Nurse Iverson's testimony questioning Mr. McBride's claim to have an injured eye (*Id.*). Mr. McBride told Chief Deputy Gorman that this injury resulted from the fight in which he had been

(*Id.*).  Detainee Mr. Carter gave identical testimony to Chief Deputy Gorman—that Mr. McBride's eye was "real swollen," "he couldn't see out of it," and it was clear "it hasn't been opened for a few days." (*Id.*).

It is undisputed that Lieutenant Baker was off work on June 2, 2021 (*Id.*, ¶ 20).

### 3.    Events Of June 3, 2021

On June 3, 2021, at 7:55 a.m., Nurse Evans-Shelton notes that she received magnesium citrate from JRMC emergency room, that Mr. McBride was asleep during pill call, and that she informed Lieutenant Surell DeBerry to pour liquid in a cup for Mr. McBride upon awakening (*Id.*, ¶ 21).  Ms. Heard admits this and cites record evidence that Nurse Evans-Shelton "was found to have violated JCSO policies and procedures by failing to administer Dezmen McBride the medicine he was prescribed" (*Id.*).

According to Lieutenant Baker, on June 3, 2021, at 9:00 a.m., Nurse Iverson notes that Mr. McBride was standing at the window and stated, "I need a shower nurse, can I have a shower?" (*Id.*, ¶ 22).  Lieutenant Baker contends that Nurse Iverson asked Captain Adams if he would give McBride a shower (*Id.*).  Lieutenant Baker contends that Captain Adams said, "Yes, but he needs to clean his cell up." (*Id.*).  According to Lieutenant Baker, Nurse Iverson relayed this to Mr. McBride, and Mr. McBride said, "Okay, give me a broom." (*Id.*).  According to Lieutenant Baker, when Nurse Iverson left booking, Mr. McBride was cleaning his cell (*Id.*).  Lieutenant Baker contends that, when Nurse Iverson returned, Mr. McBride was showered with a clean jumpsuit, and his mat and cell appeared freshly cleaned (*Id.*).  According to Lieutenant Baker, Mr. McBride stated, "Thanks nurse," and laid down on the mat in the cell (*Id.*).  Nurse Iverson reported "no apparent distress noted." (*Id.*).

19

Ms. Heard admits that this was Nurse Iverson's testimony, but Ms. Heard denies this and cites record evidence that contradicts Nurse Iverson's testimony (*Id.*). Specifically, Ms. Heard cites record evidence that Captain Adams reported that, on June 3, 2021, Mr. McBride urinated and defecated on himself, the floor of his cell, and "everywhere" within his cell; that he had ripped up toilet paper and thrown it throughout his cell; that his mat was destroyed; and that partially-eaten food was thrown around his cell (*Id.*). When Captain Adams took Mr. McBride to shower, Captain Adams asked for help from Chief Deputy Joseph Gorman who observed Mr. McBride was "dizzy," "stumbling," and could not walk straight (*Id.*). Chief Deputy Gorman also observed that Mr. McBride was naked, apparently having removed his clothes, with only a suicide suit in his cell for clothing; Chief Deputy Gorman was told Mr. McBride kept removing his clothes (*Id.*). Chief Deputy Gorman described that Mr. McBride acted like he did not know where he was at, "fine in this one second and ten seconds later. . . a completely different person," "yelling, screaming for no reason," and repeatedly saying, "I need help, I need help," but unable to respond when asked by Chief Deputy Gorman what help Mr. McBride needed (*Id.*). Ms. Heard cites record evidence from Detainee Mr. Carter who cleaned Mr. McBride's cell while he was in the shower and who reported that Mr. McBride "had been beating on the door of his cell, asking for help, screaming that his brain was bleeding." (*Id.*).

Lieutenant Baker was off work on June 3, 2021 (*Id.*, ¶ 23).

### 4.    Events Of June 4, 2021

It is undisputed that on June 4, 2021, Lieutenant Baker was on shift (*Id.*, ¶ 24). Lieutenant Baker claims that he was not told of any particular problems or issues with Mr. McBride (*Id.*). Lieutenant Baker admits, however, that he reviewed the shift briefing notes that indicated Mr. McBride was sent to the hospital days prior (*Id.*).

20

Ms. Heard denies this, and with citation to record evidence, asserts that Lieutenant Baker knew that Mr. McBride was sent to the hospital days prior after a fight and that he believed Mr. McBride was on suicide watch (*Id.*).

During his interactions with Mr. McBride on June 4, 2021, according to Lieutenant Baker, Lieutenant Baker observed Mr. McBride "laying around, not doing too much. [Mr. McBride] didn't get up and walk around like everybody else do or stand in the windows, and then [Mr. McBride] just laid down [and] kept his head covered up." (*Id.*, ¶ 25). Mr. McBride was verbal during Lieutenant Baker's shift (*Id.*). According to Lieutenant Baker, Mr. McBride would "yell out [of] his room, or he was saying he wanted to go or something like that for something." (*Id.*). According to Lieutenant Baker, Mr. McBride was "just normally like anybody else, just talking, really." (*Id.*). Lieutenant Baker claims that Mr. McBride did not complain to Lieutenant Baker about medical issues (*Id.*).

Ms. Heard denies this and, with citation to record evidence, claims that Lieutenant Baker's assertion that Mr. McBride did not complain on June 4, 2021, about his medical issues contradicts testimony from multiple other officers who testified that Mr. McBride complained consistently about his medical issues on June 2 and June 3, 2021, including citations to record evidence involving Deputy Anderson, Sergeant Etherly, Lieutenant Smith, Chief Deputy Gorman, Captain Anderson, and Detainee Mr. Carter (*Id.*).

According to Lieutenant Baker, on June 4, 2021, at 6:00 p.m., Nurse Iverson noted that Mr. McBride was lying on the mat on the floor of his cell, that he took his medications, was verbally responsive though sometimes mumbling, tearing up paper and throwing it on the floor, and that no acute distress was noted at that time (*Id.*, ¶ 26). Lieutenant Baker maintains that Nurse Iverson further stated that Mr. McBride would remain in booking to be monitored by security (*Id.*).

Ms. Heard denies this, and Ms. Heard asserts with citation to record evidence that Mr. McBride died 18 hours after Nurse Iverson decided that Mr. McBride was not in "acute distress," and that Ms. Heard's expert's opinion is that it was due to "the deliberate indifference" of defendants "ignoring signs like these of dizziness and being unable to walk" (*Id.*).

### 5.    Events of June 5, 2021

On the morning of June 5, 2021, Lieutenant Baker was assigned to the booking area (*Id.*, ¶ 27).  Soon after Lieutenant Baker arrived on shift, he noticed food and food trays thrown everywhere in Mr. McBride's cell, that his mat was torn up, that his blanket was weird, and that he was lying on the floor of his cell (*Id.*, ¶ 28).  At that time, Lieutenant Baker obtained cleaning supplies and requested that Detainee Mr. Carter assist him in cleaning Mr. McBride's cell (*Id.*).  Detainee Mr. Carter is Mr. McBride's uncle (*Id.*).

Lieutenant Baker claims that Mr. McBride was naked in his cell and that Mr. McBride told Lieutenant Baker that he used the bathroom on himself and needed to take a shower (*Id.*, ¶ 29).  Lieutenant Baker maintains that he did not observe any excrement indicating that Mr. McBride soiled himself (*Id.*).  According to Lieutenant Baker, Mr. McBride further stated that he could not get up (*Id.*).  Lieutenant Baker maintains that detainees will "a lot of times" fake that they cannot walk (*Id.*).

Ms. Heard denies these assertions and, with citation to record evidence, claims that Mr. McBride was found lying naked on the floor of his cell on June 5, 2021, and he told Lieutenant Baker that he could not stand up (*Id.*).  Ms. Heard claims that Lieutenant Baker originally told Internal Affairs that he believed Mr. McBride's inability to stand up and walk to and from the shower was because "most of the time [detainees will] lay there and they get stiff, they can't walk and stuff like that." (*Id.*).  Ms. Heard further asserts that Lieutenant Baker later admitted in

deposition testimony that detainees do not actually lose the ability to walk because they have been lying down for long periods; instead, Lieutenant Baker changed his testimony to assert that detainees regularly fake not being able to walk (*Id.*).

According to Lieutenant Baker, Detainee Mr. Carter, at times with Lieutenant Baker's assistance, pulled Mr. McBride to the shower (*Id.*, ¶ 30). Ms. Heard admits that Detainee Mr. Carter and Lieutenant Baker "dragged" Mr. McBride to the shower, but with citation to record evidence, Ms. Heard disputes Lieutenant Baker's characterization of Mr. McBride's state at this time and disputes the nature in which Mr. McBride was moved to the shower (*Id.*). Citing record evidence, Ms. Heard claims that, when Detainee Mr. Carter initially lifted Mr. McBride off the floor to a standing position, Mr. McBride urinated all over him (*Id.*). Detainee Mr. Carter jumped back, letting go of Mr. McBride, and McBride stood upright for only three or four seconds before he collapsed on the concrete floor (*Id.*). Ms. Heard further asserts that, because Mr. McBride could not walk or stand, Detainee Mr. Carter grabbed his arms and "pulled" him naked through the prison to the shower (*Id.*). According to Ms. Heard, when Detainee Mr. Carter got tired at the halfway point, Detainee Mr. Carter stopped, and Lieutenant Baker began to help him, each of them taking one of Mr. McBride's arms and pulling him (*Id.*).

Lieutenant Baker claims that, once at the shower, Lieutenant Baker provided Mr. McBride with soap and a towel; that Mr. McBride sat on the shower floor and bathed himself; and that as Mr. McBride showered Lieutenant Baker and Detainee Mr. Carter cleaned Mr. McBride's cell (*Id.*, ¶ 31). Ms. Heard denies this and cites record evidence that, while in the shower, Mr. McBride complained about his arms and legs hurting and complained that Mr. McBride could not bathe himself, asking Detainee Mr. Carter to wash him (*Id.*). Ms. Heard cites record evidence to assert that Detainee Mr. Carter initially refused and that Detainee Mr. Carter and Lieutenant Baker

"cracked a joke about" Mr. McBride's request, indicating not only that Lieutenant Baker was fully aware that Mr. McBride was unable to wash himself but found that funny (*Id.*).  According to Ms. Heard, Detainee Mr. Carter finally agreed to wash Mr. McBride in the shower; that Mr. McBride did not wash himself; and that Mr. McBride could not even wipe his own eye, which Detainee Mr. Carter observed was "crusted up" and looked like it had not been opened for days (*Id.*).  Instead, according to Ms. Heard, Detainee Mr. Carter had to wipe Mr. McBride's eye for him at Mr. McBride's request (*Id.*).  Mr. McBride asked Detainee Mr. Carter to leave him in the shower because the water was helping his eye, and Detainee Mr. Carter and Lieutenant Baker returned to his cell and cleaned it (*Id.*).

Lieutenant Baker admits that, after cleaning Mr. McBride's cell, Lieutenant Baker and Detainee Mr. Carter went back to the shower area and tried to get Mr. McBride to dress out, but Mr. McBride said he could not put his clothes back on, with Lieutenant Baker asserting that Mr. McBride said, "Y'all gonna have to grab me and pull me back around there again." (*Id.*, ¶ 32).  Lieutenant Baker and Detainee Mr. Carter grabbed Mr. McBride by both arms and pulled him back into the cell (*Id.*).  According to Lieutenant Baker, once in Mr. McBride's cell, Mr. McBride was provided a blanket, jumpsuit, and boxers (*Id.*).  Lieutenant Baker claims that Mr. McBride put the boxers on, laid on the blanket, and appeared to go to sleep (*Id.*).

Ms. Heard, with citation to record evidence, denies Lieutenant Baker's characterization of Mr. McBride's state after the shower and characterization of the events that occurred in and after the shower (*Id.*).  Ms. Heard admits that Mr. McBride could not walk, stand, or dress himself and claims that, instead of getting help by contacting 911 or a Brassell Detention Center nurse, Lieutenant Baker and Detainee Mr. Carter dragged Mr. McBride naked from the shower back to his cell (*Id.*).  Further, Ms. Heard admits that Lieutenant Baker testified that he gave Mr. McBride

a jumpsuit, boxers, and a blanket, and that Mr. McBride put the boxers on and "curled up with the blanket" on the floor (*Id.*). However, Ms. Heard asserts with citation to record evidence that, when Detainee Mr. Carter returned to the shower area and tried to hand Mr. McBride a towel, Mr. McBride was shaking "so bad" and his fingers were locked up and curved in, so he could not hold it (*Id.*). According to Ms. Heard, Mr. McBride could not stand, and he laid flat on the shower floor the entire time, rolling at one point from his stomach to his side (*Id.*). Detainee Mr. Carter estimates that Mr. McBride's shower lasted 20 to 30 minutes, while Lieutenant Baker agrees it was 20 minutes (*Id.*).

Ms. Heard asserts that Lieutenant Baker told Detainee Mr. Carter that they had to get Mr. McBride back into his cell, so he could do his logs and paperwork (*Id.*). Detainee Mr. Carter told Mr. McBride that they were bringing him back to his cell and advised Mr. McBride to stop ripping up his belongings or that the staff in the Brassell Detention Center would start charging Mr. McBride for it (*Id.*). According to Ms. Heard, Detainee Mr. Carter contends that Mr. McBride got angry and started cursing "out of nowhere." (*Id.*).

Ms. Heard claims that Detainee Mr. Carter stood Mr. McBride up, encouraging Mr. McBride to walk back to his cell by himself, but Mr. McBride slid down the shower wall until Mr. McBride was on the floor again (*Id.*). According to Ms. Heard, Lieutenant Baker and Detainee Mr. Carter again took Mr. McBride's arms and dragged Mr. McBride, naked, across the Brassell Detention Center from the shower to Mr. McBride's cell (*Id.*).

Ms. Heard claims that throughout this process, Mr. McBride continually asked for help and told Detainee Mr. Carter to call Detainee Mr. Carter's mother to have Detainee Mr. Carter's mother call Mr. McBride's mother to help him (*Id.*). In response, Detainee Mr. Carter told Mr. McBride

that Detainee Mr. Carter was trying to help by showering Mr. McBride and cleaning Mr. McBride's cell, but "ain't nothing else I can do, because I'm – I'm a detainee, Nephew." (*Id.)*

Nurse Iverson reported for her shift while Mr. McBride was still in the shower (*Id.*, ¶ 33). Lieutenant Baker claims that he asked Nurse Iverson to check on Mr. McBride (*Id.*, ¶ 34). Ms. Heard denies this and, with citation to record evidence, claims that the record contradicts this statement (*Id.*).

Between 8:00 and 8:30 a.m., while Nurse Iverson was doing pill call, Mr. McBride knocked on his cell door to get Nurse Iverson's attention (*Id.*, ¶ 35). At that time, Mr. McBride was laying on the floor (*Id.*, ¶ 36). According to Nurse Iverson, "most people do that in that cell because the bench is so short they can't lay on the bench." (*Id.*). Nurse Iverson said, "When you go – when people's in that cell, most of the time you go and talk to them, they're always laying on the floor." (*Id.*). Ms. Heard admits that this was Nurse Iverson's testimony but cites record evidence that, according to Lieutenant Baker and Detainee Mr. Carter, Mr. McBride could not stand or walk, making it highly likely that Mr. McBride would not have been physically able to lift himself from the floor to the bench in his cell (*Id.*).

According to Nurse Iverson, she asked Mr. McBride how he was doing, and McBride said he was okay (*Id.*, ¶ 37). According to Nurse Iverson, she asked if Mr. McBride was hungry, and he stated that he was (*Id.*). According to Nurse Iverson, she asked Mr. McBride if he wanted a sandwich, and Mr. McBride stated that he did (*Id.*). According to Nurse Iverson, she asked Lieutenant Baker if Mr. McBride could have a sandwich, and Lieutenant Baker told her that he could at lunch (*Id.*). According to Nurse Iverson, Mr. McBride told her someone hit him in the eye; she asked to look at Mr. McBride's eyes; Mr. McBride looked at her; and Nurse Iverson did not see any redness in Mr. McBride's eye and did not notice a black eye (*Id.*). According to Nurse

Iverson, she told Mr. McBride that she did not see anything on his eye, and Mr. McBride responded, "Well, they hit me in my eye." (*Id.*). According to Nurse Iverson, she asked if Mr. McBride wanted something for his eye, and Mr. McBride stated, "No. I'm okay." (*Id.*).

Ms. Heard admits that this is Nurse Iverson's testimony but otherwise denies the statement with citation to record evidence, including statements from Chief Deputy Gorman and Detainee Mr. Carter (*Id.*).

According to Nurse Iverson, she then told Lieutenant Baker to let her know if Mr. McBride ate lunch because she did not "want him to get dehydrated or anything from not eating or drinking." (*Id.*, ¶ 38). Nurse Iverson's contemporaneous note states:

> During pill call this nurse went to check on detainee d/t mental status during the last few days; detainee was lying on mat w/o jumpsuit on; had jumpsuit under his head for pillow. This nurse asked detainee how was he doing he said "I'm okay, but they hit me in my eye." This nurse stated, "what's wrong with your eye?" Detainee stated, "I don't know, they hit me in it." This nurse asked detainee to open his eyes and look at me. Detainee opened his eyes and stated, "See." This nurse unable to fully assess d/t detainee being uncooperative, and mental status being unpredictable. This nurse asked detainee if he was hungry. Detainee stated, "Yeah." Asked if he wanted a sandwich, stated, "Yeah, hand it here." This nurse asked Lieutenant Baker if there were any sandwiches, he stated, "We will give him one at lunch because he tears up the trays." Informed detainee that he would get a sandwich for lunch, stated, "Okay." This nurse informed Lieutenant Baker to text his meal percentage; then left communications for next nurse of the above.

(*Id.*, ¶ 39). Ms. Heard admits that this was Nurse Iverson's note but denies the truth of the note (*Id.*). Ms. Heard admits that Nurse Iverson interacted with Mr. McBride because "she was concerned about his mental status over the past several days, that she described his mental status as 'unpredictable,' and that she had conversations with him about his eye and his request for food." (*Id.*).

On June 5, 2021, at 10:00 a.m., Nurse Iverson sent communications to Nurse Evans-Shelton to check on Mr. McBride when she arrived to see if he ate his lunch because Lieutenant

Baker was not sure if Mr. McBride ate breakfast, and Nurse Iverson did not want Mr. McBride to become dehydrated if he was not eating/drinking during the weekend (*Id.*, ¶ 40).  Nurse Evans-Shelton responded, "Okay." (*Id.*).

On June 5, 2021, at approximately 10:30 a.m., according to Lieutenant Baker, he made rounds to serve lunch to booking detainees (*Id.*, ¶ 41).  Lieutenant Baker maintains that he went into Mr. McBride's cell and placed two sandwiches next to Mr. McBride (*Id.*).  Lieutenant Baker also represents that he told Mr. McBride that there were sandwiches next to him, and Mr. McBride said, "Okay." (*Id.*).  According to Lieutenant Baker, Mr. McBride was also provided water and laying down at that time (*Id.*).  Lieutenant Baker claims that he believed that Mr. McBride was acting normal (*Id.*).

Ms. Heard denies this and, with citation to record evidence, claims that Lieutenant Baker did not believe that Mr. McBride was acting normal when Mr. McBride was unable to walk, stand, or bathe himself; rather, Lieutenant Baker testified that he was concerned about Mr. McBride when he dragged him to the shower (*Id.*).

According to Lieutenant Baker, shortly after, he made rounds and again checked on Mr. McBride (*Id.*, ¶ 42).  Lieutenant Baker maintains that he could not see Mr. McBride through the cell glass, so he retrieved the cell key (*Id.*).  According to Lieutenant Baker, upon opening the door, Lieutenant Baker realized that Mr. McBride was against the cell door and that Mr. McBride had a blanket over his head (*Id.*).  Lieutenant Baker maintains that he asked Mr. McBride if he was alright and that Mr. McBride did not answer (*Id.*).  Lieutenant Baker claims that Lieutenant Baker removed the blanket from Mr. McBride's head and said, "Are you okay?" (*Id.*).  According to Lieutenant Baker, Mr. McBride said, "Yeah." (*Id.*).  Lieutenant Baker maintains that he observed spit coming from Mr. McBride's mouth and stated, "You're not looking too good." (*Id.*).

Ms. Heard denies these assertions, with citation to record evidence, and asserts, among other matters, that Lieutenant Baker by that point had dragged Mr. McBride naked across the concrete floor because Mr. McBride could not walk or stand; had known for hours that Mr. McBride could not walk, stand, or bathe himself; knew that Mr. McBride had been transported to a hospital days earlier; observed Mr. McBride lying on the floor with a blanket over his head unresponsive and drooling, with a puddle of drool on the floor next to Mr. McBride's head; and believed Mr. McBride was on suicide watch (*Id.*).

According to Lieutenant Baker, he then contacted Nurse Evans-Shelton regarding Mr. McBride's condition (*Id.*, ¶ 43).  According to Lieutenant Baker, he told Nurse Evans-Shelton that Mr. McBride was not looking good and that Lieutenant Baker thought that Mr. McBride needed to be sent to the hospital (*Id.*).  Lieutenant Baker maintains that Nurse Evans-Shelton told Lieutenant Baker to send Mr. McBride out by transport, but Lieutenant Baker advised her that he needed to go by ambulance "because he - - with his health, he's not gonna be able to walk to a car." (*Id.*).  According to Lieutenant Baker, Nurse Evans-Shelton told Lieutenant Baker to call the ambulance (*Id.*).

Although Ms. Heard denies many of these assertions, Ms. Heard admits that Lieutenant Baker did finally contact a nurse and reported that Mr. McBride needed to be transported to the hospital and that Lieutenant Baker told Nurse Evans-Shelton that Mr. McBride would not be able to walk to the ambulance (*Id.*).  Ms. Heard, with citation to record evidence, states this is because Lieutenant Baker already knew that Mr. McBride could not walk or stand and had not been able to do so for hours (*Id.*).

Nurse Evans-Shelton's contemporaneous notes state that on June 5, 2021, at 11:00 a.m., "Rec'd call from Lieutenant Baker stating that detainee was not acting himself. Informed Lieutenant Baker to send out to Eval & Tx as indicated." (*Id.*, ¶ 44).

It is undisputed that at 11:06 a.m., Lieutenant Baker called MECA (911 Dispatch) and advised them to send emergency medicine and the on-call transport to the Brassell Detention Center (*Id.*, ¶ 45). Further, Ms. Heard states that Lieutenant Baker reported when doing so that Mr. McBride could not "walk, will need stretcher." (*Id.*).

Approximately three to four minutes later, EMTs arrived at Brassell Detention Center, and Lieutenant Baker escorted them to Mr. McBride's cell. EMTs provided care to Mr. McBride while waiting for the JCSO transport deputy to arrive (*Id.*, ¶ 47). The JCSO transport deputy arrived at 11:45 a.m. (*Id.*). The ambulance left Brassell Detention Center for JRMC at approximately 11:53 a.m. (*Id.*). Ms. Heard asserts, with citation to record evidence, that Mr. McBride did not respond to EMTs when they arrived and called his name; that Mr. McBride asked where he was going when placed on the stretcher; and that Lieutenant Baker handcuffed Mr. McBride and placed him in leg restraints while on the stretcher, despite knowing that Mr. McBride could not walk or stand (*Id.*).

The ambulance arrived at JRMC sometime shortly after 12:00 p.m. (*Id.*, ¶ 48). Upon arrival to JRMC, Mr. McBride's cardiac rhythm was asystole, and his body temperature was 96 degrees (*Id.*, ¶ 49). At JRMC, resuscitation was continued but was unsuccessful (*Id.*, ¶ 50). Mr. McBride was pronounced deceased at 12:18 p.m. (*Id.*, ¶ 51). The final diagnosis by JRMC emergency department was malignant ventricular arrhythmias (*Id.*, ¶ 52).

According to Lieutenant Baker, on June 7, 2021, an autopsy was performed on Mr. McBride, and the cause and manner of death was undetermined (*Id.*, ¶ 53). Ms. Heard denies this

and claims, with citation to record evidence, that the summary of the results of the autopsy reported by Lieutenant Baker is a selectively reductive summary of the autopsy findings, which omits that the autopsy found that that there was a "subgaleal contusion" to Mr. McBride's head (*Id.*).

The laboratory results on Mr. McBride's autopsy report indicate a positive drug screen result for cannabinoids (*Id.*, ¶ 54). Ms. Heard admits this and, with citation to record evidence, maintains that there was no evidence indicating Mr. McBride "was on any other drugs or that his death was the result of an overdose." (*Id.*).

Following Mr. McBride's death, the JCSO conducted an internal affairs investigation (*Id.*, ¶ 55). On December 1, 2021, Lieutenant Baker was disciplined regarding the incident with Mr. McBride (*Id.*, ¶ 56). The disciplinary letter stated, in pertinent part:

> After carefully reviewing Internal Affairs case IA-06-001-21.  [*sic*] There is sufficient evidence to establish you violated Jefferson County Sheriff Office policy and procedure.  The policy and procedure you violated is as follows:
>
> **Title 3: Section 2**
>
> **Standard of Conduct/Progressive Discipline**
>
> 3) Inefficiency
>
> Lieutenant Baker your action of allowing detainee Marlo Carter to pull detainee Mr. McBride across the floor violated Jefferson County Sheriff Office policy and procedure.  Also you violated Jefferson [C]ounty Sheriff Office policy and procedure by you not alerting or forwarding information to the detention center medical staff concerning detainee McBride['s] condition.  This was inference to his condition prior to being placed in the shower and at the conclusion of his shower.

(*Id.*). Lieutenant Baker was suspended for three days, one of which was without pay (*Id.*). Ms. Heard admits that this is what the disciplinary letter stated, in part, but Ms. Heard cites record evidence to dispute the scope of the investigation and its findings (*Id.*).

The Internal Affairs investigation identified other employees of the JCSO who violated JCSO's policy (*Id.*, ¶ 57). According to the Internal Affairs Division, Sergeant Etherly knowingly

violated policy and procedures set forth by the JCSO by "not provid[ing] the required documentation involving Detainee Dezmen McBride, relating to any disciplinary regarding a violation of the [Brassell Detention Center] Detainee Handbook." (*Id.*, ¶ 58). Additionally, "documentation was not provided in relation to the incident on June 1, 2021." (*Id.*) Sergeant Etherly resigned from the JCSO on July 2, 2021 (*Id.*).

According to the Internal Affairs Division, Lieutenant Smith knowingly violated policy and procedures set forth by the JCSO (*Id.*, ¶ 59).

> Lieutenant Smith was advised of further medical complaints by Detainee McBride, who was housed in Multi-holding cell 4. She did not alert, nor forward the information to the medical staff for further assessment of the detainee. It is the responsibility of the detention staff to inform medical staff of any complaints from detainees.

(*Id.*).

According to the Internal Affairs Division, Nurse Evans-Shelton knowingly violated policy and procedures set forth by the JCSO (*Id.*, ¶ 60).

> According to the Criminal Detention Facility Standards: Chapter IX Medical, Dental and Mental Health Care Services; p. 11 Section 9-1005 Medication Administration; All medication prescribed for the inmate shall be administered in accordance with the instructions of the designated health authority. Nurse Shelton did not administer the medication to Detainee McBride, but left the medication to be administered by Lieutenant DeBerry. Medical staff also have the responsibility of obtaining information regarding detainee's medical circumstances.

(*Id.*).

According to the Internal Affairs Division, Lieutenant DeBerry knowingly violated policy and procedures set forth by the JCSO (*Id.*, ¶ 61). The specific details of that allegation are unclear (*Id.*). Lieutenant DeBerry resigned from the JCSO on July 1, 2021 (*Id.*).

According to Lieutenant Baker, he does not have liability insurance that would cover the wrongful death claim asserted against him in the Third Amended Complaint (*Id.*, ¶ 62).  Ms. Heard denies this allegation (*Id.*).

According to Lieutenant Baker, the AACRMF is not insurance; instead, according to Lieutenant Baker, the AACRMF is a risk management fund that is not governed by the Insurance Code and that does not provide risk management or any type of coverage for claims of "tort, negligence and negligent conduct of any kind." (*Id.*, ¶ 63).  Ms. Heard denies this allegation (*Id.*).

## II.    Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial and that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *UnitedHealth Group Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact in dispute for trial).

 "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence

could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.    Overview Of Parties And Claims

Ms. Heard brings this action as a result of the death of Mr. McBride.[3] Ms. Heard alleges several counts in her operative third amended complaint: (1) wrongful death under Arkansas law against Lieutenant Baker and the County Defendants (Dkt. No. 16, ¶¶ 9–42); (2) grossly negligent hiring, retention, and supervision against the County Defendants (*Id.*, ¶¶ 43–65); (3) violation of the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-105, as a result of deliberate indifference arising from the failure to obtain timely medical attention and the use of excessive force (*Id.*, ¶¶ 66–68); (4) violation of the Arkansas Constitution against Lieutenant Baker for deliberate indifference arising from the failure to obtain timely medical attention and the use of excessive force (*Id.*, ¶¶ 69–71); (5) custom and an unwritten policy adopted by County Defendants of

---

[3] Deborah McBride commenced this action and originally was the Special Administrator of the Estate of Dezmen McBride. After Ms. McBride's death, Tanaria Heard was substituted as the Special Administrator of the Estate of Dezmen McBride (Dkt. No. 1, ¶ 8).

allowing deliberate indifference and excessive force (*Id.*, ¶¶ 72–78); (6) intentional infliction of emotional distress against Lieutenant Baker and County Defendants (*Id.*, ¶¶ 79–84); (7) due process violation of the Fourteenth Amendment to the United States Constitution against Lieutenant Baker and County Defendants (*Id.*, ¶¶ 85–92); (8) cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution against Lieutenant Baker and County Defendants (*Id.*, ¶¶ 93–100); and (9) violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution against Lieutenant Baker and County Defendants (*Id.*, ¶¶ 101–07).  Ms. Heard seeks damages and punitive damages (*Id.*, ¶¶ 108–09).

### A.    Parties To The Lawsuit

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  Government employees may be sued under § 1983 in either their official or individual capacities. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  In this case, Ms. Heard brings an individual capacity claim against only Lieutenant Baker.  Ms. Heard brings official capacity claims against Lieutenant Baker and Sherriff Woods.  She also names as a defendant Jefferson County.

Ms. Heard concedes that her claims against Lieutenant Baker and Sheriff Woods in their official capacities are essentially a suit against Jefferson County and, thus, redundant given that Jefferson County is a defendant in this matter (Dkt. Nos. 35, at 3; 47, at 8).  *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (holding that a suit against a county employee in an official capacity is a suit against the county) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).  Therefore, Ms. Heard represents that her claims against Lieutenant Baker and Sherriff Woods in their official

capacities should be dismissed (Dkt. No. 47, at 8). For these reasons, the Court dismisses Ms. Heard's claims against Lieutenant Baker and Sheriff Woods in their official capacities.

### B.    Claims Against Lieutenant Baker

In his motion for summary judgment, Lieutenant Baker acknowledges that Ms. Heard's constitutional claims against Lieutenant Baker in his individual capacity are included in counts 3, 4, 7, 8, and 9 and that these counts "result in four constitutional claims." (Dkt. No. 38, at 14–15). Lieutenant Baker maintains that Ms. Heard brings claims against him in his individual capacity for deliberate indifference to medical needs, excessive force, failure to protect, and violations of the Equal Protection Clause, and he seeks summary judgment and qualified immunity on these claims (*Id.*, at 15). Lieutenant Baker also seeks summary judgment on the state law claims of wrongful death and intentional infliction of emotional distress (*Id.*, at 23–26).

Ms. Heard clarifies in her response to Lieutenant Baker's motion for summary judgment that she is not pursuing a failure to protect claim against Lieutenant Baker (Dkt. No. 50, at 20). She also stipulates to the dismissal of her Equal Protection Clause claim (Dkt. No. 50, at 20). Therefore, the Court dismisses these claims as to Lieutenant Baker in his individual capacity.

### C.    Claims Against County Defendants

County Defendants, in their motion for summary judgment, acknowledge that Ms. Heard brings claims pursuant to 42 U.S.C. § 1983 and Arkansas state law (Dkt. No. 34, at 2). Specifically, County Defendants recognize that Ms. Heard brings claims under 42 U.S.C. § 1983 and Arkansas law that Mr. McBride's rights allegedly were violated when he failed to receive appropriate medical care and was subjected to excessive force during his incarceration at the Brassell Detention Center (Dkt. No. 35, at 1). County Defendants seek summary judgment on these claims (*Id.*).

County Defendants also seek summary judgment on the Arkansas state law claims (*Id.*, at 4–7, 9–13).

## IV.     Lieutenant Baker's Motion For Summary Judgment

Lieutenant Baker, who is sued in his individual and official capacities, advances several arguments in support of his motion for summary judgment (Dkt. No. 38).  Lieutenant Baker claims that he was not deliberately indifferent to Mr. McBride's serious medical needs because he ensured that Mr. McBride received medical care and that, at a minimum, he is entitled to qualified immunity on this claim (*Id.*, at 18).  Lieutenant Baker also claims that he did not use excessive force against Mr. McBride and that he is entitled to qualified immunity on this claim (*Id.*, at 16).  Further, Lieutenant Baker argues that he is immune from suit for Ms. Heard's state tort law claims and that the record evidence does not support Ms. Heard's claim of intentional infliction of emotional distress (*Id.*, at 24–25).

Ms. Heard opposes Lieutenant Baker's motion for summary judgment for several reasons.  First, Ms. Heard maintains that Lieutenant Baker was deliberately indifferent to Mr. McBride's serious medical needs and that Lieutenant Baker is not entitled to qualified immunity on this claim (Dkt. No. 50, at 4).  Second, Ms. Heard claims that Lieutenant Baker subjected Mr. McBride to excessive force and that Lieutenant Baer is not entitled to qualified immunity on this claim (*Id.*, at 19).  Lastly, Ms. Heard argues that Lieutenant Baker is not immune from the state law claims (*Id.*, at 20).  The Court addresses each argument in turn.

### A.     Qualified Immunity Standard

Lieutenant Baker is sued in his individual and official capacity.  Officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense.  This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly

established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). "To determine whether [an official] is entitled to qualified immunity, [the court] must consider, in either order, two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation." *Willis v. Mills*, 141 F.4th 905, 911 (8th Cir. 2025) (quotations omitted).

### B.    Lieutenant Baker's Alleged Deliberate Indifference

Lieutenant Baker claims that he was not deliberately indifferent to Mr. McBride's medical needs and that Lieutenant Baker ensured that Mr. McBride received medical care (Dkt. No. 38, at 18). Lieutenant Baker seeks summary judgment in his favor and qualified immunity on the deliberate indifference claim (*Id.*, at 22). Ms. Heard opposes Lieutenant Baker's motion and asserts that he was deliberately indifferent to Mr. McBride's medical needs and is not entitled to qualified immunity (Dkt. No. 50, at 4).

"Prisoners have a 'clearly established constitutional right to . . . have [their] serious medical needs attended to.'" *Whitney v. City of St. Louis,* 887 F.3d 857, 860 (8th Cir. 2018) (alteration in original) (quoting *Yellow Horse v. Pennington Cnty.*, 225 F.3d 923, 927 (8th Cir. 2000)). "The Eighth Amendment prohibits jail officials from acting with deliberate indifference" to the needs of inmates, and "[t]he Fourteenth Amendment extends this protection to pretrial detainees." *Id.* (citing *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003)); *see McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) (determining that the same standards apply to Fourteenth Amendment and Eighth Amendment deliberate indifference claims). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'" prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg*

38

*v. Georgia*, 428 U.S. 153, 173 (1976)).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.*

"[W]hether an official was deliberately indifferent requires both an objective and a subjective analysis." *Whitney*, 887 F.3d at 860 (quoting *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)).

> Objectively, the medical need must be serious.  It must be one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.  And subjectively, a prison official must have actually kn[own about], but deliberately disregarded the need, which is a mental state comparable to criminal recklessness.

*Beard v. Falkenrath*, 97 F.4th 1109, 1118 (8th Cir. 2024) (alterations in original) (internal citations omitted).  With respect to the subjective prong, the "evidence must show that the [official] recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light of that risk." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (citing *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)).  "Generally, the actor manifests deliberate indifference by intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." *Davis v. Buchanan Cnty.*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *Krout*, 583 F.3d at 567).

As an initial matter, Lieutenant Baker appears to question what Mr. McBride's serious medical need was (Dkt. No. 38, at 19).  Lieutenant Baker claims that Mr. McBride did not have a medical condition diagnosed by a medical professional that needed treatment, nor was Mr. McBride's medical need so obvious that a layperson would recognize it (*Id.*).  The Court is unpersuaded by Lieutenant Baker's argument that Mr. McBride's medical need was not obvious.

It is undisputed that Mr. McBride was transported to the JRMC on June 1, 2021, following an altercation with another detainee, and discharged during the early morning hours of June 2, 2021; it is disputed as to whether Mr. McBride headbutted the other detainee during the altercation (Dkt. No. 46, ¶¶ 3–4). It is further undisputed that the hospital documented that Mr. McBride reported that he was vomiting blood and was hit in the head (*Id.*, ¶ 5). Before being discharged on June 2, 2021, Mr. McBride was given fluids and pain medication, prescribed Zofran, and given dietary restrictions (*Id.*). The discharge instructions provided that Mr. McBride was to return immediately to the emergency department if his symptoms worsened (Dkt. No. 37-9, at 6).

Undisputed record evidence also reflects that Lieutenant Baker was aware that Mr. McBride could not stand or walk, so in response, Lieutenant Baker dragged Mr. McBride to and from the shower (Dkt. No. 49, ¶¶ 30–32). *See Krout*, 583 F.3d at 569 ("We assume for purposes of this appeal that [the inmate's] inability to walk or feel his legs, as well as his difficulty breathing as the morning progressed, constitute objectively serious medical needs.")

While in the shower, Mr. McBride could not wipe his own eye, which Detainee Mr. Carter observed was "crusted up" and looked like it had not been opened for days (Dkt. No. 49, ¶ 31). Instead, according to Ms. Heard, Detainee Mr. Carter had to wipe Mr. McBride's eye for him at Mr. McBride's request (*Id.*). Mr. McBride asked Detainee Mr. Carter to leave him in the shower because the water was helping his eye, and Detainee Mr. Carter and Lieutenant Baker returned to his cell and cleaned it (*Id.*).

In addition, Ms. Heard also claims that Mr. McBride said that he could not bathe himself and asked Detainee Mr. Carter to help him (*Id.*, ¶ 31). Ms. Heard claims that Detainee Mr. Carter initially refused, and Detainee Mr. Carter and Lieutenant Baker "cracked a joke about" Mr. McBride's request, indicating not only that Lieutenant Baker was fully aware that Mr. McBride

was unable to wash himself but that Lieutenant Baker found it funny (*Id.*).  Lieutenant Baker claims that he had no knowledge of Mr. McBride asking for help (Dkt. No. 53, at 7).  However, the record evidence discussed previously indicates that there is a genuinely disputed issue of material fact about whether Lieutenant Baker had knowledge of Mr. McBride asking for help (*see* Dkt. No. 49-6, at 18).

Ms. Heard also maintains that, after cleaning Mr. McBride's cell while he showered, when Lieutenant Baker and Detainee Mr. Carter returned to the shower area, Detainee Mr. Carter tried to hand Mr. McBride a towel, but Mr. McBride was shaking "so bad" and his fingers were locked up and curved in that Mr. McBride could not hold the towel (*Id.*).  Lieutenant Baker claims that Detainee Mr. Carter did not state that Lieutenant Baker was there and that there is no evidence that Lieutenant Baker was there; Lieutenant Baker further claims that he did not have knowledge of Mr. McBride's inability to hold a towel due to shaking (Dkt. No. 53, at 5).  It is undisputed that Mr. McBride told Lieutenant Baker that he was unable to dress himself (Dkt. No. 49, ¶ 32).

The record evidence, when construed in favor of Ms. Heard, could lead a reasonable jury to conclude that a layperson could recognize that Mr. McBride was suffering from an objectively serious medical condition.

Next, the Court turns to the subjective prong of the deliberate indifference analysis. Lieutenant Baker claims that, even if Mr. McBride had an objectively serious medical condition, Lieutenant Baker did not deliberately disregard it (Dkt. No. 38, at 19).  Lieutenant Baker claims that he did not interact with Mr. McBride from June 1 to 3, 2021 (*Id.*).  Specifically, Lieutenant Baker claims that there is no evidence that Lieutenant Baker had any interactions with Mr. McBride on June 1, 2021 (Dkt. No. 49, ¶ 15).  Ms. Heard, with citation to record evidence, denies this assertion (*Id.*).

Ms. Heard maintains that the lieutenant on the day shift on June 1, 2021, was Lieutenant Baker (*Id.*).  Lieutenant Smith noted that Lieutenant Baker did not inform her of any issues with Mr. McBride during June 1, 2021, and that nothing was noted in the briefing notes (*Id.*).  Lieutenant Smith noted that it was unusual that Lieutenant Baker did not make any notes that Mr. McBride was vomiting and complaining of head pain:  "I said, well, if he was having all these problems during the day shift . . . which was [Lieutenant] Baker's shift, why didn't they let one of the officers know." (*Id.*).  Ms. Heard cites to record evidence that other detainees in the unit with Mr. McBride during the day on June 1, 2021, attempted repeatedly to "let one of the officers know" about Mr. McBride's condition that day but were ignored (*Id.*).  Therefore, based on this record evidence, coupled with Lieutenant Baker's claims (Dkt. No. 53, at 5) that he was unaware of these facts, it is disputed whether Lieutenant Baker knew on June 1, 2021, that Mr. McBride vomited blood and other detainees asked for help (Dkt. Nos. 37-8; 49-4, at 20; 49-3, at 2–4).  In other words, there are genuine issues of material fact in dispute about what Lieutenant Baker knew regarding Mr. McBride's condition on June 1, 2021.

Further, Ms. Heard, with citation to record evidence, maintains that Mr. McBride "did not see a nurse after the fight, because there was no nurse on duty at the time" and that Mr. McBride "did not see a nurse or receive medical treatment during the day on June 1, 2021, even though the fight was documented in booking notes for the next shift" and even though other witnesses observed Mr. McBride's condition and called "like, five or six times" for a nurse (*Id.*).  Ms. Heard, with citation to record evidence, maintains that "[o]n the night of June 1, 2021, over twelve hours after the fight, [Sergeant] Etherly called the prison nurse on his cell phone and told her that [Mr. McBride] had been in an altercation and had a 'knot' on his head," with the nurse advising Sergeant Etherly to have Mr. McBride transported to the hospital (*Id.*).

Mr. McBride returned from the hospital on June 2, 2021 (Dkt. No. 49, ¶ 16). Record evidence with all reasonable inferences drawn in favor of Ms. Heard demonstrates that a reasonable juror could conclude that, upon returning from the hospital on June 2, 2021, until his death on June 5, 2021, Mr. McBride continued to experience and complain of his worsened medical condition and that Lieutenant Baker was or should have been aware.

Deputy Anderson, who transported Mr. McBride to and from the emergency department, testified that Mr. McBride vomited on the way to the emergency department; vomited on the way back to the Brassell Detention Center after his discharge; continued to complain about head pain and nausea on the way back to the Brassell Detention Center; and said that he was afraid to fall asleep, which Deputy Anderson found "strange" (*Id.*). Lieutenant Baker claims that there is no evidence that he was aware of this (Dkt. No. 53, at 9–10).

Ms. Heard claims, with citation to record evidence, that Sergeant Etherly placed Mr. McBride in a quarantine pod when he returned to the Brassell Detention Center because Sergeant Etherly observed that Mr. McBride appeared weak and complained that he did not feel well and that his head hurt (Dkt. No. 49, ¶ 16). Lieutenant Baker claims that there is no evidence that he was aware of this (Dkt. No. 53, at 10). Ms. Heard asserts, with citation to record evidence, that Mr. McBride made a phone call around 3:40 a.m. to the mother of Mr. McBride's young daughter and told her his head was throbbing and that he was throwing up (Dkt. No. 49, ¶ 16).

Ms. Heard further adds with citation to record evidence that, on June 2, 2021, Mr. McBride complained to Lieutenant Smith that his head was hurting and that he could not see (*Id.*). Lieutenant Baker claims that there is no evidence that he was aware of this and that he was not on shift when this occurred (Dkt. No. 53, at 10). According to Ms. Heard, Lieutenant Smith told Mr.

McBride to report his symptoms to the nurse because they were not going to transport him back to the hospital because he had already been there and been discharged (Dkt. No. 49, ¶ 16).

There is record evidence that on June 2, 2021, other inmates told Captain Armstrong that Mr. McBride "was wearing his blanket as a cape, talking to himself, and acting 'crazy,'" along with kicking the door of his cell; Captain Armstrong moved Mr. McBride to the booking cell (Dkt. No. 49, ¶ 17).

Ms. Heard cites record evidence that Captain Adams reported that, on June 3, 2021, Mr. McBride urinated and defecated on himself, the floor of his cell, and "everywhere" within his cell; that Mr. McBride had ripped up toilet paper and thrown it throughout his cell; that his mat was destroyed; and that partially-eaten food was thrown around his cell (*Id.*, ¶ 22). When Captain Adams took Mr. McBride to shower, Captain Adams asked for help from Chief Deputy Joseph Gorman who observed that Mr. McBride was "dizzy," "stumbling," and could not walk straight (*Id.*). Chief Deputy Gorman also observed that Mr. McBride was naked, apparently having removed his clothes, with only a suicide suit in his cell for clothing; Chief Deputy Gorman was told that Mr. McBride kept removing his clothes (*Id.*). Chief Deputy Gorman described that Mr. McBride acted like he did not know where he was at, Mr. McBride was "fine in this one second and ten seconds later. . . a completely different person," "yelling, screaming for no reason," and repeatedly saying, "I need help, I need help," but unable to respond when asked by Chief Deputy Gorman what help Mr. McBride needed (*Id.*). Lieutenant Baker claims that he was not working on this day and that there is no evidence that he was aware of this (Dkt. No. 53, at 11). Ms. Heard cites record evidence from Detainee Mr. Carter who cleaned Mr. McBride's cell while he was in the shower and who reported that Mr. McBride "had been beating on the door of his cell, asking for help, screaming that his brain was bleeding." (Dkt. No. 49, ¶ 22). Although it is undisputed

44

that Lieutenant Baker was off work on June 2 and 3, 2021, (*Id.*, ¶¶ 20, 23), the record reflects that, at a minimum, Lieutenant Baker was made aware of Mr. McBride's hospital visit (Dkt. No. 46-37).

Further, the record reflects that, on the morning of June 5, 2021, the day that Mr. McBride died, Lieutenant Baker was aware of Mr. McBride's serious medical condition because Mr. McBride could not stand, walk, wash, or dress himself (Dkt. No. 49, ¶¶ 30–32). There is record evidence that, after Mr. McBride finished his shower and Lieutenant Baker observed that he still could not walk or stand, Lieutenant Baker told Detainee Mr. Carter that they had to get Mr. McBride back into his cell so that Lieutenant Baker could do his logs and paperwork (*Id.*).

The record further reflects that, after dragging Mr. McBride back to his cell after the shower, Lieutenant Baker left him for two hours before returning to check on him (Dkt. No. 49-19, at 2–4). Based on the record evidence, with all reasonable inferences construed in favor of Ms. Heard, a reasonable jury could conclude that it is was only at that point that Lieutenant Baker called for medical assistance and that such conduct constituted an unreasonable and unconstitutional delay in seeking medical care for Mr. McBride on the part of Lieutenant Baker. This record evidence, construed in favor of Ms. Heard, could lead a jury to find that Lieutenant Baker acted with deliberate indifference to Mr. McBride's serious medical needs. *See Davis*, 11 F.4th at 624 (quoting *Krout*, 583 F.3d at 567 ("Generally, the actor manifests deliberate indifference by intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed.")).

For purposes of the qualified immunity analysis, even if the Court determines that Lieutenant Baker was deliberately indifferent to Mr. McBride's serious medical needs, Lieutenant Baker is still entitled to qualified immunity unless the unconstitutionality of his conduct was

clearly established at the time of the incident. *Partlow*, 774 F.3d at 501. At the time of the incident, it was clearly established that "intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed" can constitute deliberate indifference in violation of the constitution. *Krout*, 583 F.3d at 567.

From the record evidence, viewed in the light most favorable to Ms. Heard, the nonmoving party, a reasonable jury could determine that Ms. Heard's account of the facts is true and that Lieutenant Baker was deliberately indifferent to Mr. McBride's serious medical needs. The applicable law was clearly established at the time of the events giving rise to this claim. As a result, Lieutenant Baker is not entitled to summary judgment or qualified immunity on Ms. Heard's deliberate indifference claim.

## C.    Lieutenant Baker's Alleged Excessive Force

Lieutenant Baker claims that the undisputed evidence reflects that he did not use excessive force against Mr. McBride, and, in the event that Lieutenant Baker did, he claims that he is entitled to qualified immunity (Dkt. No. 38, at 15).[4] In response, Ms. Heard claims that summary judgment on this claim is not warranted because Lieutenant Baker subjected Mr. McBride to excessive force and because Mr. McBride's right to be free from excessive force was clearly established at the time giving rise to this cause of action (Dkt. No. 50, at 19).

The Court acknowledges that Ms. Heard concedes that the Fourteenth Amendment's Due Process Clause applies to a pretrial detainee's excessive force claims, not the Eighth Amendment

---

[4] Ms. Heard alleges violations of Arkansas Code Annotated § 16-123-101 *et seq.* stemming from Lieutenant Baker's alleged use of excessive force (Dkt. No. 16, ¶¶ 66–68). Under Arkansas law, when determining whether the ACRA has been violated, Arkansas courts "look for guidance to state and federal decisions interpreting the Civil Rights Act of 1871, as amended and codified in 42 U.S.C. § 1983." Ark. Code Ann. § 16-123-105(c). Therefore, Ms. Heard's claims under the ACRA are analyzed with her constitutional claims. *See Island v. Buena Vista Resort*, 103 S.W.3d 671, 675–76 (Ark. 2003).

or the Fourteenth Amendment's Equal Protection Clause (Dkt. No. 47, at 49).  *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–99 (2015).  Although the Court agrees that the Supreme Court has held that the Fourteenth Amendment applies to alleged violations of a pretrial detainee's right to be free from excessive force, because the standards for deliberate indifference and excessive force for pretrial detainees are different even though they are analyzed under the same constitutional amendment, the Court chooses to proceed with the analysis of this claim.

The Fourteenth Amendment's Due Process Clause provides that a pretrial detainee cannot be punished prior to a finding of the detainee's guilt.  *Bell v. Wolfish*, 441 U.S. 520, 537 (1979).  To prevail on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley*, 576 U.S. at 396–97.  In making this determination, courts are to consider the perspective of a reasonable officer and what the officer knew at the time of the incident.  *Id.* at 397.

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used:  the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Based on these factors and the record evidence with all reasonable inferences construed in favor of Ms. Heard, a reasonable jury could conclude that the use of force by Lieutenant Baker on Mr. McBride was objectively unreasonable and, therefore, unconstitutional.  Here, the record reflects that Mr. McBride needed a shower and could not stand or walk, and Lieutenant Baker, assisted by Detainee Mr. Carter, dragged Mr. McBride, who was naked, by Mr. McBride's arms through the Brassell Detention Center to the shower (Dkt. No. 49, ¶¶ 29–30).  Ms. Heard cites record evidence that, while Mr. McBride was in the shower, Mr. McBride could not stand, and

Mr. McBride laid flat on the shower floor the entire time, rolling at one point from his stomach to his side (*Id.*, ¶ 32).  Once Mr. McBride finished his shower, 20 to 30 minutes later, he still was unable to stand or walk (*Id.*).  Once again, Lieutenant Baker, enlisted the help of Detainee Mr. Carter to drag Mr. McBride naked through the prison by his arms back to his cell, where Lieutenant Baker left Mr. McBride alone in his cell so that Lieutenant Baker could write his reports and do his other duties (*Id.*).

There is no record evidence to establish a security issue with respect to Mr. McBride at the time, nor is there record evidence to establish that Mr. McBride was resisting authority in any way that would warrant the use of force.  Instead, a reasonable jury could conclude based on the record evidence, with all reasonable inferences construed in favor of Ms. Heard, that this was a "non-[security] emergency situation . . ." and that Lieutenant Baker's use of force against Mr. McBride "crossed a constitutional line." *Fuller v. Hafoka*, Case No. 21-2854, 2023 WL 1487884 at * 2 (8th Cir. Feb. 3, 2023) (citing *Smith v. Conway Cnty.*, 759 F.3d 853, 859 (8th Cir. 2014)).

Lieutenant Baker asserts that the record reflects that he used *de minimis* force on Mr. McBride, which according to Lieutenant Baker, is not actionable under the Fourth Amendment (Dkt. No. 53, at 3 (citing *Westwater v. Church*, 60 F.4th 1124, 1129 (8th Cir. 2023)).  However, under the Fourteenth Amendment, which governs Ms. Heard's claims, Ms. Heard has to establish that the force used against Mr. McBride was "objectively unreasonable" as discussed above.  *See Kingsley*, 576 U.S. at 396–97; *see also Davis v. White*, 794 F.3d 1008, 1011–12 (8th Cir. 2015) ("The Court has not decided whether the Fourth Amendment applies to claims by detainees in custody.").  Moreover, the record evidence with all reasonable inferences construed in favor of

Ms. Heard supports that a reasonable fact finder could conclude that Lieutenant Baker used more the *de minimis* force on Mr. McBride under these circumstances.

For purposes of the qualified immunity analysis, even if the Court determines that Lieutenant Baker's use of force was unconstitutionally excessive, Lieutenant Baker is still entitled to qualified immunity unless the unconstitutionality of his conduct was clearly established at the time of the incident. *Partlow*, 774 F.3d at 501. "A plaintiff need not produce a case directly on point for us to conclude that the right he alleges was violated was clearly established at the time of the violation . . . ." *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). "The dispositive question is whether the violative nature of particular conduct is clearly established . . . in light of the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks omitted)). The Eighth Circuit Court of Appeals has held that an officer crosses the constitutional line when the officer uses unnecessary force on an individual who is not resisting and not posing a security threat. *Fuller*, 2023 WL 1487884, at *2; *see, e.g., Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) (holding that an officer went too far when he conducted a leg sweep maneuver on a person who "was not threatening anyone, was not actively resisting arrest, and was not attempting to flee"); *Neal v. Ficcadenti*, 895 F.3d 576, 582 (8th Cir. 2018) ("[T]he state of the law would have given a reasonable officer fair warning that using physical force against a suspect who was not resisting or threatening anyone was unlawful.")

From the record evidence, viewed in the light most favorable to Ms. Heard, the nonmoving party, a reasonable jury could determine that Ms. Heard's account of the facts is true and that Lieutenant Baker used excessive force during his interaction with Mr. McBride. The applicable law was clearly established at the time of the events giving rise to this claim. As a result,

Lieutenant Baker is not entitled to summary judgment or qualified immunity on Ms. Heard's excessive force claim.

### D.   State Law Tort Claims And Statutory Immunity

Lieutenant Baker claims that he is entitled to statutory immunity on Ms. Heard's claims for wrongful death.  For the reasons explained in this Order, the Court finds that as an employee of Jefferson County, Arkansas, Arkansas Code Annotated § 21-9-301 shields Lieutenant Baker from liability for negligent acts.  *See Autry v. Lawrence,* 696 S.W.2d 315, 316 (Ark. 1985) (holding that Arkansas Code Annotated § 21-9-301 statutory immunity extends to the officers and employees of political subdivisions).[5]

However, this statutory immunity does not extend to intentional torts.  Therefore, the Court next analyzes Ms. Heard's claims for wrongful death and intentional inflection of emotional distress against Lieutenant Baker.

### 1.   Wrongful Death

Lieutenant Baker maintains that he is entitled to Arkansas Code Annotated § 21-9-301's grant of immunity because Ms. Heard's wrongful death claim is based in negligence (Dkt. No. 38, at 23).  In response, Ms. Heard claims that Arkansas Code Annotated § 21-9-301 does not apply to intentional acts (Dkt. No. 50, at 20).  Under Arkansas Code Annotated § 16-62-102, an individual can be liable for the death of a person when the death is "caused by a wrongful act, neglect, or default . . . ."  An intentional killing is a "wrongful act" that is likely covered by

---

[5] The Court does not understand Ms. Heard to bring negligence or gross negligence claims against Lieutenant Baker (*see* Dkt. No. 16); instead, Ms. Heard brings a claim for "grossly negligent hiring, retention, and supervision" against County Defendants (*Id.*, ¶¶ 43–65), which the Court addresses in this Opinion and Order.  To the extent Ms. Heard intended to bring negligence or gross negligence claims against Lieutenant Baker, those claims would be barred by statutory immunity.

Arkansas Code Annotated § 16-62-102.  *See Rutherford v. Foster*, 125 F. 187, 195 (8th Cir. 1903) (applying Arkansas law to a wrongful death case and holding that the intentional assault and battery with a deadly weapon resulting in death was presumptively "wrongful" under Arkansas law); *Tillar v. Reynolds*, 131 S.W. 969, 972 (Ark. 1910) (allowing a widow to recover for the wrongful death of her husband who died from a beating).  The record reflects that there is a disputed issue of material fact as to whether Mr. McBride's death was the result of intentional conduct.

Namely, it is disputed as to whether Lieutenant Baker was deliberately indifferent to Mr. McBride's serious medical needs when Lieutenant Baker was aware of Mr. McBride's serious medical condition because Mr. McBride could not stand, walk, wash, or dress himself (Dkt. No. 49, ¶¶ 30–32).  It is further disputed that, after Mr. McBride finished his shower and Lieutenant Baker observed that he still could not walk, stand, bathe, or dress himself, Lieutenant Baker told Detainee Mr. Carter that they had to get Mr. McBride back into his cell so that Lieutenant Baker could do his logs and paperwork (*Id.*).  The record further reflects that, after dragging Mr. McBride back to his cell after the shower, Lieutenant Baker left him for two hours before returning to check on him (Dkt. No. 49-19, at 2–4).  Lieutenant Baker was aware that Mr. McBride could not walk and waited over two hours to seek medical assistance for Mr. McBride (Dkt. No. 49, ¶¶ 30–32).

It is also disputed as to whether Lieutenant Baker used excessive force against Mr. McBride when Lieutenant Baker dragged Mr. McBride naked through the jail (*Id.*, ¶¶ 29–32).  Further, the characterization of Mr. McBride's autopsy results and the injuries he sustained at death are also in dispute (*Id.*, ¶¶ 52–53).  Therefore, there are genuine issues of material fact in dispute as to whether Mr. McBride's death was the result of Lieutenant Baker's allegedly intentional acts.  As a result,

Lieutenant Baker is not entitled to summary judgment in his favor on Ms. Heard's wrongful death claim against him.

### 2.    Intentional Infliction Of Emotional Distress

In an action for outrage or the intentional infliction of emotional distress, a plaintiff must sufficiently allege four elements: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct; (2) the defendant's conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Williams v. Mannis*, 889 F.3d 926, 932 (8th Cir. 2018) (quoting *Crockett v. Essex*, 19 S.W.3d 585, 589 (Ark. 2000)). Generally, Arkansas courts look to several factors to determine whether conduct is "extreme and outrageous." *Doe v. Wright*, 82 F.3d 265, 269 (8th Cir. 1996). Those factors include: the conduct at issue; the amount of time over which the conduct took place; the relationship between the plaintiff and defendant; and the defendant's knowledge that the plaintiff is particularly susceptible to emotional distress by some mental or physical peculiarity. *Id.*

The Arkansas Supreme Court has repeatedly held that "the tort of outrage is not favored by this court and that clear cut proof is required to establish the elements in outrage cases*.*" *Rorie v. United Parcel Serv., Inc*., 151 F.3d 757, 762 (8th Cir. 1998) (quoting *Shepherd v. Wash. Cnty*., 962 S.W.2d 779, 792 (Ark. 1998)). As such, Arkansas courts have taken a strict approach to determining the validity of an outrage claim, recognizing that the "tort of outrage should not and does not open the doors of the courts to every slight insult or indignity one must endure in life." *Tandy Corp. v. Bone*, 678 S.W.2d 312, 315 (Ark. 1984). The type of conduct that meets the

standard for outrage is determined case by case.  *Crockett*, 19 S.W.3d at 589.  Merely describing

conduct as outrageous does not make it so.  *Id.*  Even gross negligence cannot be characterized as

"atrocious or exceeding all possible bounds of decency."  *Wood v. Nat'l Comput. Sys., Inc.*, 814

F.2d 544, 545 (8th Cir. 1987).

Based on the record evidence, with all reasonable inferences construed in favor of Ms.

Heard, a reasonable jury could conclude that Lieutenant Baker knew or should have known that

his actions would inflict emotional distress on Mr. McBride.  It is undisputed that Lieutenant Baker

conducted a welfare check on Mr. McBride on the morning of June 5, 2021 (Dkt. No. 46, ¶ 10).

Although it is disputed whether Mr. McBride explicitly communicated to Lieutenant Baker that

he could not walk when Lieutenant Baker came to get Mr. McBride for his shower, it is undisputed

that Lieutenant Baker observed that Mr. McBride could not walk (*Id.*, ¶ 11).  Mr. McBride used

the bathroom on himself and needed to take a shower, but Mr. McBride could not get up (*Id.*, ¶

29).  Lieutenant Baker, along with Detainee Mr. Carter at Lieutenant Baker's direction, "pulled"

Mr. McBride to the shower (*Id.*, ¶ 30).

Moreover, video footage from the Brasell Detention Center's security cameras shows that

Lieutenant Baker, along with Detainee Mr. Carter at Lieutenant Baker's direction, dragged Mr.

McBride, who could not stand or walk and was naked at the time, across the floor to the shower

(Dkt. No. 48).  Rather than alert the nurse or get Mr. McBride medical assistance, the record

reflects that Lieutenant Baker, along with Detainee Mr. Carter, returned Mr. McBride to his cell

after his shower, by once again dragging him naked through the Brasell Detention Center (Dkt.

No. 46, ¶ 12).

Next, the record reflects that Lieutenant Baker waited approximately two hours after

dragging Mr. McBride back to his cell to inform the nurse that Mr. McBride needed medical

assistance (Dkt. No. 46-37, at 12). Further, the characterization of the state that Mr. McBride was in when Lieutenant Baker returned to conduct a welfare check after returning him to his cell after the shower is disputed. Lieutenant Baker claims that Mr. McBride had trouble breathing and was spitting on the floor (*Id.*, ¶ 12). However, Ms. Heard claims, with citation to record evidence, that "Lieutenant Baker reported that it was more than having difficulty breathing, instead that [Mr. McBride] was largely unresponsive and drooling, with a 'whole bunch' of saliva puddled on the floor next to his head." (*Id.*, ¶ 12; *see* Dkt. No. 46-41, at 2). Mr. McBride's state after being dragged by Lieutenant Baker is a disputed triable issue of material fact and bears on whether Lieutenant Baker's actions caused the intentional infliction of emotional distress to Mr. McBride (Dkt. No. 46, ¶¶ 11–12).

Based on the record evidence, with all reasonable inferences construed in favor of Ms. Heard, a reasonable jury could conclude that such conduct in regard to Mr. McBride was "extreme and outrageous" and "beyond all possible bounds of decency." *See Williams*, 889 F.3d at 932 (quoting *Crockett*, 19 S.W.3d at 589). A reasonable jury also could conclude that a reasonable person could not be expected to endure the severe distress Mr. McBride endured after being dragged naked through the Brassell Detention Center and being found sometime after struggling to breathe and spitting on the floor. On the undisputed record evidence before this Court, construing all reasonable inferences in favor of Ms. Heard, the Court denies Lieutenant Baker's motion for summary judgment on Ms. Heard's intentional infliction of emotional distress claim.

## V.    County Defendants' Motion For Summary Judgment

County Defendants advance several arguments in support of their motion for summary judgment. County Defendants assert that Ms. Heard cannot prove County Defendants were deliberately indifferent to Mr. McBride's serious medical needs or used excessive force with

respect to Mr. McBride (*Id.*, at 7). Moreover, County Defendants claim that Ms. Heard cannot establish that any policy or custom was "the moving force" behind any purported deliberate indifference or alleged use of excessive force (*Id.*). County Defendants claim that, should they be found liable, they are entitled to sovereign immunity for their law enforcement detention activities (*Id.*, at 9–10). County Defendants also argue that Ms. Heard's claims for wrongful death, negligence, gross negligence, outrage and/or vicarious liability are barred by statutory tort immunity (*Id.*, at 4). Lastly, County Defendants claim that Ms. Heard's request for punitive damages is barred because Jefferson County is absolutely immune from such damages (*Id.*, at 17). Ms. Heard opposes County Defendants' motion for summary judgment (Dkt. No. 47). The Court addresses each argument in turn.

A.    **Liability Of County Defendants For Deliberate Indifference And Excessive Force**

Having concluded that, from the record evidence with all reasonable inferences drawn in favor of Ms. Heard, a reasonable jury could conclude that Lieutenant Baker was deliberately indifferent and used excessive force against Mr. McBride and that genuine issues of material fact are in dispute and remain for trial, the Court next turns to whether County Defendants can be held liable for Lieutenant Baker's actions. The Supreme Court has held that a municipal government cannot be held liable under 42 U.S.C. § 1983 solely for the actions of its employees. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691–92 (1978). The municipality can only be held liable for its own unconstitutional policies or customs. *Id.* at 694. Thus, for § 1983 liability to attach to a municipality, there must be an official municipal policy giving rise to the violation, and "absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." *Whitney*, 887 F.3d at 861 (citing *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir.

55

2017); *Sitzes v. City of W. Memphis Ark.*, 606 F.3d 461, 470 (8th Cir. 2010); *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)).

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Mitchell v. Kirchmeier*, 28 F.4th 888, 899 (8th Cir. 2022) (internal quotation marks omitted) (quoting *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998)). "Policy and custom are not the same thing" under *Monell*. *Corwin v. City of Indep.*, 829 F.3d 695, 699–700 (8th Cir. 2016).

> To show a custom or usage, the plaintiff must prove (1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the governmental entity's custom.

*Mitchell*, 28 F.4th at 899 (internal quotation marks omitted); *see Troupe v. Young*, 143 F.4th 995, 973 (8th Cir. 2025).

"[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (citing *Ware*, 150 F.3d at 880). Municipal policies include actions by its legislative body and decisions or actions by employees who possess final authority to establish municipal policy with respect to the action ordered. *Barnett v. Short*, 129 F.4th 534, 545 (8th Cir. 2025); *Corwin*, 829 F.3d at 700. A local government or municipality may be held liable for deficient hiring or its failure to train and supervise its employees. *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010).

As the Supreme Court explained:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." [*City of*] *Canton* [*v. Harris*], 489 U.S. [378, 388, (1989)]. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."

*Connick*, 563 U.S. at 61 (2011). Moreover, to establish municipal liability, there must be a "direct causal link between" the policy or custom and the alleged constitutional violation. *Canton*, 489 U.S. at 385. In other words, the plaintiff bears the burden to demonstrate that the policy or custom was the "moving force" behind the alleged constitutional violation. *Monell*, 436 at 694.

County Defendants assert that Ms. Heard cannot prove that any policy or custom was "the moving force" behind any alleged deliberate indifference to Mr. McBride's serious medical needs or the alleged excessive force Liuetenant Baker used on Mr. McBride (Dkt. No. 35, at 7). According to Ms. Heard, there was an "unconstitutional custom and practice" in how Jefferson County hired, retained, and supervised Lieutenant Baker; Ms. Heard further asserts that this alleged custom and practice was the moving force behind Mr. McBride's death (Dkt. No. 47, at 13–14). Specifically, Ms. Heard claims that "[i]t is the County and Woods' custom and practice to allow Baker to bully, threaten, and physically harm inmates, to neglect their care while they are in the Defendants' custody, and to lie about it during investigations." (*Id.*).

For County Defendants to be liable under a theory of municipal liability, how County Defendants hire, retain, and supervise "employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [employees] come into contact.'" *See Connick*,

563 U.S. at 61.  Here, Ms. Heard points to the fact that the County hired Lieutenant Baker despite having knowledge that:  Lieutenant Baker was a decertified law enforcement officer; that Lieutenant Baker was known to be untruthful in investigations; and that Lieutenant Baker had been fired twice prior to Mr. McBride's death due to his treatment of inmates (Dkt. No. 47, at 14).

In 2014, Lieutenant Baker was fired by the JCSO for using excessive force against an inmate in violation of Jefferson County Sheriff Office's policies when he allegedly punched a detainee at least 12 times in and around the face (*see* Dkt. No. 46-15, at 110–12).  As a result of Lieutenant Baker's conduct and at the request of the JCSO, on July 2, 2015, Lieutenant Baker was decertified as an Arkansas law enforcement officer by the State of Arkansas Commission on Law Enforcement Standards and Training (Dkt. No. 46-12, at 2).

In addition to his 2014 JCSO termination, Lieutenant Baker was also fired by the Arkansas Department of Correction ("ADC") in 2007 for using excessive force against an inmate and for lying about the incident to his superiors (Dkt. No. 46-4, at 2–3).  County Defendants conducted a background check on Lieutenant Baker before hiring him for the first time in 2007 that references his ADC termination (Dkt. No. 46-8, at 2–4).  Despite this knowledge of Lieutenant Baker's 2007 termination from the ADC and his 2014 termination from Jefferson County, Jefferson County rehired Lieutenant Baker in 2018 (Dkt. No. 46-15, at 161).

Further, in her response to the motion for summary judgment, Ms. Heard maintains that County Defendants were aware of other, prior inmate deaths in the Brassell Detention Center resulting from the failure of staff to seek prompt medical attention, putting County Defendants on notice of the deficiencies of their policies, customs, and practices with respect to providing medical attention to inmates in need, like Mr. McBride (Dkt. No. 47, at 21–22 (citing to record evidence identifying prior cases against County Defendants)).  In addition, record evidence in this case

includes disputed issue of fact regarding County Defendants' policies, customs, and practices, and the application of those policies, customs, and practices in this case, along with the results of the Internal Affairs investigation into Mr. McBride's death that concluded Lieutenant Baker and other employees of the JSCO violated various JCSO's policies during these events (Dkt. Nos. 46, ¶¶ 19–23; 49, ¶¶ 55–61).

For these reasons, Ms. Heard maintains that County Defendants had notice of Lieutenant Baker's pattern of being deliberately indifferent to the needs of, and using excessive force against, detainees and that County Defendants were deliberately indifferent to it or tacitly authorized it by continuing to hire Lieutenant Baker and by failing to supervise him appropriately and by permitting to continue the unconstitutional practices and customs about which County Defendants were aware.

This Court determines that there are genuine issues of material fact in dispute regarding official capacity claims against County Defendants and that, with all reasonable inferences from the record evidence drawn in favor of Ms. Heard, a reasonable juror could conclude that County Defendants are liable and that the County Defendants' deficiencies were "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." *See Parrish*, 594 F.3d at 998. On the record before the Court, construing all reasonable inferences in Ms. Heard's favor, the Court finds that there is a triable issue of material fact as to whether County Defendants had a policy or custom, or whether there is evidence of misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law, giving rise to the constitutional violations that Ms. Heard maintains caused injury to Mr. McBride. Therefore, the Court denies the County Defendant's motion for summary judgment.

### B.    Sovereign Immunity

County Defendants claim that they are entitled to state sovereign immunity in the light of the Supreme Court's holding in *McMillian v. Monroe County*, 520 U.S. 781 (1997) (Dkt. No. 35, at 9–10). In *McMillian*, the Court noted that sovereign immunity was a "question of state law," and after interpreting the Alabama Constitution, the Court held that the Monroe County Sheriff was entitled to Alabama sovereign immunity because he represented the state, not the county, when executing his law enforcement duties. *McMillian*, 520 U.S. at 786, 793. Although County Defendants argue that, under Arkansas law, the reasoning in *McMillian* should extend to Arkansas sheriffs, (Dkt. No. 35, at 10–13), the Arkansas Supreme Court has yet to speak on this issue. As it currently stands under Arkansas law, Jefferson County and its employees are distinct from the state and its employees. *See Dermott Special Sch. Dist. v. Johnson*, 32 S.W.3d 477, 480 (Ark. 2000). As a political division, Jefferson County is similar to the school district in *Dermott*, which the Arkansas Supreme Court held was not "shielded from suit by constitutional sovereign immunity." 32 S.W.3d at 481; *see also Granger v. Pulaski Cnty.*, 26 Ark. 37 (1870), *overruled on other grounds by Par. v. Pitts*, 429 S.W.2d 45 (Ark. 1968) ("Counties are a political division of the State government, organized as part and parcel of its machinery, like townships, school districts, and kindred subdivisions."). Therefore, County Defendants are not entitled to summary judgment in their favor on their claim of state sovereign immunity.

### C.    Statutory Immunity

#### 1.    Intentional Torts

Under Arkansas law:

(a) It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, public charter schools, special improvement districts, law enforcement agencies for and certified law enforcement officers employed by a public or private institution of higher education, and all

other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.

(b) No tort action shall lie against any such political subdivision because of the acts of its agents and employees

Ark. Code Ann. § 21-9-301.

The Arkansas Supreme Court has held that Arkansas Code Annotated § 21-9-301 does not apply to intentional acts. In *Battle v. Harris*, 766 S.W.2d 431, 433 (Ark. 1989), the Arkansas Supreme Court held:

> although we have held that the public officials named under § 21–9–301 are immune from tort liability, *viz.,* negligent acts committed in the performance of their official duties, *Autry v. Lawrence,* 286 Ark. 501, 696 S.W.2d 315 (1985), we have never interpreted that immunity to include intentional torts committed by those officials. We reject any suggestion to do so now.

*Id.*

Here, County Defendants argue that they are immune from liability under Arkansas Code Annotated § 21-9-301 for Ms. Heard's claims for wrongful death, negligence, gross negligence, and outrage (*Id.*, at 4). In response, Ms. Heard claims that Arkansas Code Annotated § 21-9-301 does not apply to intentional torts, which she maintains her claims are (Dkt. No. 47, at 11–12). In their reply to Ms. Heard's response, County Defendants cite cases preceding the line of Arkansas Supreme Court cases that set precedent on this issue, and County Defendants cite persuasive, not binding, authority in an effort to contradict the Arkansas Supreme Court's holding on this issue (*See* Dkt. No. 52, at 2–4).

The Arkansas Supreme Court reaffirmed that the immunity provided by Arkansas Code Annotated § 21-9-301 does not apply to intentional torts in *Deitsch v. Tillery*, 833 S.W.2d 760, 762 (Ark. 1992). There, the Arkansas Supreme Court held that, "the tort of outrage, also known as the intentional infliction of emotional distress . . . is an intentional tort. . . . Section 21–9–301

61

does not provide immunity for the intentional acts of [counties] and their employees, only their negligent acts." *Id.* (citing *Waire v. Joseph*, 825 S.W.2d 594 (Ark. 1992)).

The Arkansas Supreme Court's precedent makes clear that Arkansas Code Annotated § 21-9-301 does not apply to intentional torts. Therefore, County Defendants' argument that they are entitled to statutory immunity on Ms. Heard's claim for intentional infliction of emotional distress fails.

However, County Defendants are correct that Arkansas Code Annotated § 21-9-301's grant of immunity applies to negligence, including gross negligence, assuming that County Defendants do not have liability insurance which would make the statute inapplicable even to the covered claims. *See Doe v. Baum*, 72 S.W.3d 476, 487 (Ark. 2002) (applying Ark. Code Ann. § 21-9-301 in a case involving gross negligence but finding that defendant's conduct did not rise to negligence or gross negligence).

Ms. Heard argues that her wrongful death claim should go forward (Dkt. No. 47, at 8–12). In response, County Defendants maintain that Arkansas Code Annotated § 21-9-301's immunity for negligence extends to wrongful death claims (Dkt. No. 52, at 3–4). Based on the record, it is disputed whether Ms. Heard's wrongful death claim is the result of intent on behalf of Lieutenant Baker; Ms. Heard puts forth the same arguments and disputed facts for her wrongful death claim as she does for her excessive force and deliberate indifference claims, which the Court analyzes in this Order (Dkt. No. 47, at 40). Because the hallmark of a deliberate indifference claim is that the defendant was aware of a risk, and acted in a disregard for that risk, there is a triable issue of material fact as to whether Ms. Heard's wrongful death claim is the result of an intentional act. Therefore, the Court finds that, on the record before it, it is disputed whether Arkansas Code

Annotated § 21-9-301's immunity for negligence extends to Ms. Heard's wrongful death claim.

## 2.    "Liability Insurance" Under Arkansas Law

Here, Ms. Heard brings this action against AACRMF pursuant to Arkansas Code Annotated § 23-79-210 on the sole premise that AACRMF is liability insurance under Arkansas Code Annotated § 21-9-301 (Dkt. No. 16, ¶ 5).

Arkansas Code Annotated § 23-79-210 provides in relevant part:

(a)(1) When liability insurance is carried by any cooperative nonprofit corporation, association, or organization, or by any municipality, agency, or subdivision of a municipality, or of the state, or by any improvement district or school district, or by any other organization or association of any kind or character and not subject to suit for tort, and if any person, firm, or corporation suffers injury or damage to person or property on account of the negligence or wrongful conduct of the organization, association, municipality, or subdivision, its servants, agents, or employees acting within the scope of their employment or agency, then the person, firm, or corporation so injured or damaged shall have a direct cause of action against the insurer with which the liability insurance is carried to the extent of the amounts provided for in the insurance policy as would ordinarily be paid under the terms of the policy.

(2) Any self-insurance fund, pooled liability fund, or similar fund maintained by a medical care provider for the payment or indemnification of the medical care provider's liabilities for medical injuries under § 16-114-201 et seq. shall be deemed to be liability insurance susceptible to direct action under this section.

(3) The insurer shall be directly liable to the injured person, firm, or corporation for damages to the extent of the coverage in the liability insurance policy, and the plaintiff may proceed directly against the insurer regardless of the fact that the actual tortfeasor may not be sued under the laws of the state.

Ark. Code. Ann. § 23-79-210.

Arkansas Code Annotated § 16-114-201 specifies that:

"Medical care provider" means a physician, certified registered nurse anesthetist, physician's assistant, nurse, optometrist, chiropractor, physical therapist, dentist, podiatrist, pharmacist, veterinarian, hospital, nursing home, community mental health center, psychologist, clinic, or not-for-profit home healthcare agency licensed by the state or otherwise lawfully providing professional medical care or services, or an officer, employee, or agent thereof acting in the course and scope of employment in the providing of such medical care or medical services.

Ark. Code. Ann. § 16-114-201.

The parties dispute whether AACRMF is considered "liability insurance" under Arkansas law and would consequently make Arkansas Code Annotated § 21-9-301's grant of immunity for negligent torts inapplicable to County Defendants.  County Defendants maintain that, because AACRMF is not insurance and does not provide coverage for negligent tort liability, AACRMF is entitled to summary judgment a matter of law (Dkt. No. 35, at 4–5).  Ms. Heard argues that, even if Arkansas Code Annotated § 21-9-301 applies because of the claims alleged, County Defendants would not be statutorily immune because AACRMF provides County Defendants with liability insurance as evidenced by the General Liability Protection Agreement ("Protection Agreement") (Dkt. No. 47, at 10–11; Dkt. No. 46-2).  Ms. Heard further asserts that AACRMF is a proper defendant under Arkansas Code Annotated § 23-79-210.

The Eighth Circuit has not addressed the issue of whether AACRMF is considered "liability insurance" under Arkansas law, and the Court finds the Western District of Arkansas's handling of this issue persuasive. *See Hearnsberger v. Bradley Cnty.*, Case No. 06-CV-1081, 2007 WL 2350287 (W.D. Ark. Aug. 16, 2007); *Est. of Rodriguez by Castillo v. Union Cnty.*, Case No. 1:23-CV-1006, 2024 WL 3553281 (W.D. Ark. July 26, 2024).

In *Hearnsberger*, the Court concluded that AACRMF is not "liability insurance" as used in Arkansas Code Annotated § 23-79-210(a).  *Hearnsberger*, 2007 WL 2350287, at * 2 (citing *Kauffman v. Bd. of Trs. of the Ass'n of Ark. Cntys. Risk Mgmt. Fund*, Case No. 87-2076 (W.D.Ark.1988)).  The Western District of Arkansas reaffirmed this determination in *Union County* and also addressed whether AACRMF is  "liability insurance" as used in Arkansas Code Annotated § 23-79-210(a) (2) which provides that "[a]ny self-insurance fund, pooled liability fund, or similar fund maintained by a medical care provider for the payment or indemnification of the

64

medical care provider's liabilities for medical injuries under § 16-114-201 et seq . . . " is liability insurance. *Union Cnty.*, 2024 WL 355328 at *1–2.  In *Union County*, plaintiff brought a § 1983 action against the Union County Detention Center stemming from the death of a detainee who died shortly after being released*. Union Cnty.*, 2024 WL 355328 at *1–2.  There, to determine whether AACRMF is considered "liability insurance" and thus subject to a direct cause of action under Arkansas Code Annotated § 23-79-210(a) (2), the Western District of Arkansas interpreted the referenced statute, Arkansas Code Annotated § 16-114-201(2), and noted that

> Under the "ordinary and usually accepted meaning" of the language within § 16-114-201(2), Union County cannot be viewed as a medical provider.  *ConAga Foods*, 2013 Ark. 502, 4, 431 S.W.3d 200, 202.  That language clearly applies to professions and entities whose purpose is to directly provide medical treatment, such as a physician, nursing home, or pharmacist.  Ark. Code Ann. § 16-114-201(2).  There is no reasonable reading of that language that would allow it to apply to a county.

*Union Cnty.*, 2024 WL 355328 at *5.  Therefore, because Union County was not a "medical provider" under Arkansas Code Annotated § 23-79-210(a)(2), it could not be treated as "liability insurance" subject to a direct cause of action under Arkansas Code Annotated § 23-79-210(a)(1).  (*Id.*).  The court concluded that because AACRMF was not "liability insurance" under Arkansas Code Annotated § 23-79-210(a), and because plaintiff's sole theory of liability against AACRMF rested entirely on the applicability of Arkansas Code Annotated § 23-79-210(a) to AACRMF, plaintiff's claims against AACRMF failed as a matter of law.  *Union Cnty.*, 2024 WL 355328 at *5.

Similar to *Union County* where plaintiff brought her claims against AARCMF under Arkansas Code Annotated § 23-79-210(a) due to AACRMF's relationship with a county detention center, here too Ms. Heard's claims are against a county detention center – the Brassell Detention Center – and Ms. Heard's theory of liability against AACRMF rests on the applicability of

Arkansas Code Annotated § 23-79-210(a) to AACRMF (Dkt. No. 16, ¶ 5).  The Court finds that AACRMF is not "liability insurance" under Arkansas Code Annotated § 23-79-210(a)(1), nor is AACRMF a "medical provider" pursuant to Arkansas Code Annotated § 16-114-201(2) that would consequently deem it to be "liability insurance" under Arkansas Code Annotated § 23-79-210(a)(2).

In sum, the Court adopts the reasoning in *Hearnsberger* and *Union County* to conclude that the plain statutory language indicates that AACRMF is not "liability insurance" under Arkansas law.  Therefore, because AACRMF is not liability insurance under Arkansas law, Ms. Heard does not have a direct cause of action against AACRMF.  On this record, because AACRMF is not a liability insurer subject to a direct cause of action under Arkansas law, the Court finds that AACRMF is entitled to judgment as a matter of law on all of Ms. Heard's claims.

Assuming *arguendo* that AACRMF was determined to be "liability insurance" covered under Arkansas Code Annotated § 21-9-301, the Protection Agreement excludes protection for negligent acts.  "[A] municipal corporation's immunity for negligent acts only begins where its insurance coverage leaves off."  *City of Caddo Valley v. George*, 9 S.W.3d 48, 484 (Ark. 2000). It therefore follows that under Arkansas Code Annotated § 21-9-301, a covered entity is not subject to suit "for negligence unless the [covered entity] carries liability insurance covering *the particular negligent act*."  *Pa Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 954 (8th Cir. 2004) (emphasis added) (citing Ark. Code Ann. § 21-9-301).  Here, the record reflects that the Protection Agreement provides in part:  "this Agreement does not provide protection for liability arising from the following (including attorney fees) . . . [ne]gligence, including negligence of any degree." (Dkt. No. 46-2, at 10).

66

The Court finds that County Defendants are entitled to statutory immunity under Arkansas law for Ms. Heard's negligence claims; therefore, summary judgment is granted to County Defendants on Ms. Heard's claims for negligence and gross negligence because County Defendants are immune from liability under Arkansas Code Annotated § 21-9-301 and do not have liability insurance that covers these claims. The Court will proceed with its analysis with respect to Ms. Heard's intentional tort claims—wrongful death and intentional infliction of emotional distress.

### D.    Vicarious Liability For Intentional Tort Claims

As discussed above, Arkansas Law does not provide County Defendants with statutory immunity for Ms. Heard's intentional tort claims. Under the theory of vicarious liability, an employer can be held liable for the intentional torts of its employee. *Porter v. Harshfield*, 948 S.W.2d 83, 86 (Ark. 1997). However, "in order to render the employer liable, [the employee's act] must pertain to something that is incident to the employee's duties and which it is his duty to perform or for the benefit of the employer." *Id.* (citing *Sweeden v. Atkinson Imp. Co*., 125 S.W. 439 (Ark. 1910). In other words, the employer can be liable "if the employee was acting within the scope of his or her employment at the time of the incident." *Id.* (citing *Gordon v. Planters & Merchs. Bancshares*, *Inc.*, 935 S.W.2d 544 (Ark. 1996). "Whether the employee's action is within the scope of the employment depends on whether the individual is carrying out the 'object and purpose of the enterprise,' as opposed to acting exclusively in his own interest." *Id.*

Here, Ms. Heard's intentional tort allegations against County Defendants are the result of the County Defendants' employees Nurse Evans-Shelton and Lieutenant Baker (*See* Dkt. No. 16, ¶¶ 9–42; ¶¶ 79–84). With respect to Ms. Heard's wrongful death claim, the Court finds that Nurse Evans-Shelton and Lieutenant Baker's actions that are alleged to have resulted in the wrongful

death of Mr. McBride were in the scope of Nurse Evans-Shelton and Lieutenant Baker's employment. Namely, Ms. Heard alleges that Nurse Evans-Shelton did not administer Mr. McBride's prescribed medication, which falls within the scope of her duties as a nurse (Dkt. No. 16, ¶¶ 18–19; 37). With respect to Ms. Heard's intentional infliction of emotional distress claim, the Court finds that Lieutenant Baker's actions alleged to have intentionally inflicted emotional distress upon Mr. McBride were in the scope of Lieutenant Baker's actions as a lieutenant. It is undisputed, and the record evidence reflects, that Lieutenant Baker, along with Detainee Mr. Carter at Lieutenant Baker's direction, dragged Mr. McBride, who was naked at the time, across the floor to the shower when Mr. McBride could not walk and then waited two hours after this incident to inform the nurse that Mr. McBride needed medical assistance (Dkt. No. 46, ¶¶ 11–13).

Therefore, the Court finds that Nurse Evans-Shelton and Lieutenant Baker acted within the scope of their employment, and thus, County Defendants can be held vicariously liable for the alleged intentional torts committed by Nurse Evans-Shelton and Lieutenant Baker. Having established that vicarious liability applies, next the Court analyzes the alleged intentional torts.

### E.    Wrongful Death

Under Arkansas Code Annotated § 16-62-102, an individual can be liable for the death of a person when the death is "caused by a wrongful act, neglect, or default . . . ." An intentional killing is a "wrongful act" that is likely covered by Arkansas Code Annotated § 16-62-102. *See Rutherford*, 125 F. at 195 (applying Arkansas law to a wrongful death case and holding that the intentional assault and battery with a deadly weapon resulting in death was presumptively "wrongful" under Arkansas law); *Tillar*, 131 S.W. at 972 (allowing a widow to recover for the wrongful death of her husband who died from a beating). Here Ms. Heard alleges that Nurse Evans-Shelton and Lieutenant Baker's actions caused Mr. McBride's death (Dkt. No. 16, ¶¶ 9–

42).  Specifically, Ms. Heard claims that County Defendants are liable for the wrongful death of

Mr. McBride because they failed to obtain follow-up medical care for Mr. McBride and subjected

him to "degrading and dehumanizing treatment that resulted in his emotional and physical pain

and suffering, and his eventual death." (Dkt. No. 47, at 32–36).  County Defendants maintain that,

even assuming they are not entitled to statutory immunity on Ms. Heard's wrongful death claim,

her wrongful death claim fails because Ms. Heard offers no proof of negligence by the County

(Dkt. No. 35, at 5).

The record reflects that the cause of Mr. McBride's death is disputed.  According to Ms.

Heard, County Defendants omit that  the autopsy found that:  there was a "subgaleal contusion" to

Mr. McBride's head; there was not a finding of "significant trauma" ; and there was no evidence

at the time of the autopsy of "acute life-threatening injury."  Ms. Heard further claims that the

autopsy did not state that Mr. McBride "did not have intracranial bleeding,"  but rather, the autopsy

states  that there was no intracranial bleeding  present at the time of the autopsy (Dkt. No. 46, ¶

18).  Because Mr. McBride's cause of death is disputed, it is disputed as to whether County

Defendants caused or contributed to Mr. McBride's death.  There are issues of material fact in

dispute regarding Ms. Heard's wrongful death claim that preclude this Court from granting

summary judgment in favor of County Defendants on this claim.

### F.    Intentional Infliction Of Emotional Distress

In an action for outrage or the intentional infliction of emotional distress, a plaintiff must

sufficiently allege four elements:  (1) the defendant intended to inflict emotional distress or knew

or should have known that emotional distress was a likely result of his conduct; (2) the defendant's

conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was

"utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's

distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Williams*, 889 F.3d at 932 (quoting *Crockett*, 19 S.W.3d at 589).

The record reflects that Lieutenant Baker knew or should have known that his actions would inflict emotional distress on Mr. McBride. It is undisputed that Lieutenant Baker conducted a welfare check on Mr. McBride on the morning of June 5, 2021 (Dkt. No. 46, ¶ 10). Although it is disputed whether Mr. McBride explicitly communicated to Lieutenant Baker that he could not walk when Lieutenant Baker came to get Mr. McBride for his shower, it is undisputed that Lieutenant Baker observed that Mr. McBride could not walk (*Id.*, ¶ 11).

Moreover, video footage from the Jefferson County Jail's security cameras shows that Lieutenant Baker, along with Detainee Mr. Carter at Lieutenant Baker's direction, dragged Mr. McBride, who could not stand or walk and was naked at the time, across the floor to the shower (Dkt. No. 48). Rather than alert the nurse or get Mr. McBride medical assistance, the record reflects that Lieutenant Baker, along with Detainee Mr. Carter, returned Mr. McBride to his cell after his shower, by once again dragging him naked through the jail (Dk.t No. 46, ¶ 12). A reasonable jury could conclude that enlisting the help of another detainee to drag a naked detainee, who cannot walk, through the hallways of the jail to the shower is "extreme and outrageous" and "beyond all possible bounds of decency."

Next, the record reflects that Lieutenant Baker waited approximately two hours after dragging Mr. McBride back to his cell to inform the nurse that Mr. McBride needed medical assistance (Dkt. No. 46-37, at 12). Further, the characterization of the state that Mr. McBride was in when Lieutenant Baker returned to conduct a welfare check after returning him to his cell after the shower is disputed. Lieutenant Baker claims that Mr. McBride had trouble breathing and was

spitting on the floor (*Id.*, ¶ 12). However, Ms. Heard claims, with citation to record evidence, that "Lieutenant Baker reported that it was more than having difficulty breathing, instead that [Mr. McBride] was largely unresponsive and drooling, with a 'whole bunch' of saliva puddled on the floor next to his head." (*Id.*, ¶ 12; *see* Dkt. No. 46-41, at 2). Mr. McBride's state after being dragged by Lieutenant Baker is a disputed triable issue of material fact and bears on whether Lieutenant Baker's actions caused the intentional infliction of emotional distress to Mr. McBride (Dkt. No. 46, ¶¶ 11–12). Lastly, a reasonable jury could conclude that a reasonable person could not be expected to endure the severe emotional distress Mr. McBride endured after being dragged naked through the jail and being found sometime after struggling to breathe and spitting on the floor (*Id.*).

On the record evidence before this Court, construing all reasonable inferences in favor of Ms. Heard, the Court denies County Defendants' motion for summary judgment on Ms. Heard's claims for wrongful death and intentional infliction of emotional distress.

### G.    Punitive Damages

County Defendants assert that Jefferson County is immune from punitive damages as a matter of law and entitled to summary judgment with respect to Ms. Heard's claim for punitive damages (Dkt. No. 35, at 16–17). Ms. Heard does not address this argument in her response to County Defendants motion for summary judgment (Dkt. No. 47). The Court agrees with County Defendants that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *See*

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  Therefore, Ms. Heard is barred from seeking punitive damages from County Defendants.

## VI.    Conclusion

For the foregoing reasons, the Court grants, in part, and denies, in part, County Defendants' motion for summary judgment and grants, in part, and denies, in part, Lieutenant Baker's motion for summary judgment.

With respect to Lieutenant Baker's motion for summary judgment, the Court:

(1) denies Lieutenant Baker's motion and request for qualified immunity with respect to Ms. Heard's deliberate indifference and excessive force claims (Dkt. No. 36); and

(2) denies Lieutenant Baker's motion with respect to Ms. Heard's intentional infliction of emotional distress and wrongful death claims (*Id.*).

Specifically, with respect to County Defendants, the Court:

(1) denies County Defendants' motion and denies County Defendants' request for municipal immunity on Ms. Heard's deliberate indifference claim (Dkt. No. 34);

(2) denies County Defendants' motion and denies County Defendants' request for municipal immunity on Ms. Heard's excessive force claim (*Id.*);

(3) grants County Defendants' motion on Ms. Heard's negligence and gross negligence claims (*Id.*);

(4) denies County Defendants' motion on Ms. Heard's intentional infliction of emotional distress and wrongful death claims (*Id.*);

(5) denies County Defendants' request for sovereign immunity (*Id.*); and

(6) grants County Defendants' motion on Ms. Heard's claim for punitive damages against County Defendants.

72

Further, at her request, the Court dismisses Ms. Heard's official capacity claims against Sheriff Woods and Lieutenant Baker and dismisses Ms. Heard's failure to protect and Fourteenth Amendment Equal Protection Clause claims.

It is so ordered this 30th day of September, 2025.

_____
Kristine G. Baker
Chief United States District Judge